# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

### No. 2014-CV-____

---

J GRAHAM ZAHORUIKO,

           Plaintiff Pro Se

-against-

RICHARD GLEICHER;
THOMAS H. CURRAN;
JOHN D. CUMMINGS, JR.;
JOHN P. BOWEN;
CHRISTOPHER K. PFIRRMAN;
NICHOLAS J. MAIMONIS;
PREMIER CAPITAL;
PREMIER CAPITAL LLC;
PREMIER CAPITAL LLC a Delaware Limited
Liability Company;
PREMIER CAPITAL LLC a Massachusetts
Limited Liability Company;
PREMIER CAPITAL, LLC;
PREMIER CAPITAL, LLC a Delaware Limited
Liability Company;
PREMIER CAPITAL, LLC a Massachusetts
Limited Liability Company;
PREMIER CAPITAL LIMITED LIABILITY
COMPANY;
PREMIER CAPITAL LIMITED LIABILITY
COMPANY, a Delaware Limited Liability
Company;
PREMIER CAPITAL LIMITED LIABILITY
COMPANY, a Massachusetts Limited Liability
Company;
SANTANDER BANK (formerly Sovereign Bank);
and
JOHN DOES 1-100
           Defendants.

---

CIVIL COMPLAINT   4:14-cv-40077-TSH

JURY TRIAL REQUESTED

## Table of Contents

SUMMARY OF THE CASE ........................................................................................................... 4

The Parties ............................................................................................................................ 10

Jurisdiction and Venue ......................................................................................................... 16

Summary of Facts.................................................................................................................. 16

Defendants Conducted the Enterprise ................................................................................. 26

    The Enterprise.................................................................................................................26

    Predicate Acts.................................................................................................................35

    Defendants' Overall Scheme to Defraud ....................................................................... 35

        Conducting extortionate credit transactions [18 USCS §§ 891 through 894]............................ 37

        Mail fraud 18 USCS § 1341 ............................................................................................ 37

        Wire fraud 18 USCS § 1343 ........................................................................................... 38

        Interference with commerce, robbery, or extortion 18 USCS § 1951 ......................................... 38

        Laundering of monetary instruments, 18 USCS § 1956 ............................................... 39

        Engaging in monetary transactions in property derived from specified unlawful........................ 40

DEFENDANTS' PATTERN OF RACKETEERING AND METHODS OF COMMISSION .......................... 41

    Intentionally creating confusing corporate names and identities ........................................... 42

    Defendants are affiliated in intricately financial personal and corporate dealings with each other,
    serving on each other's Boards and Managing each other's corporations throughout the country . 43

    Defendants never provided Plaintiff-debtors advance notice of their claims to collect debt in writing,
    choosing instead to shock them by taking drastic actions such as seizing their homes, or re-
    instating an original debt on a minor technicality after substantial payment had been made already.45

    Defendants wholly disrespected the corporate formalities usually afforded corporations, by pursuing
    Refresh Software Corporation's President while PREMIER CAPITAL LLC - named companies
    totally ignored their own legal status during crucial time periods in question; The company was
    never qualified to do business within the state of Massachusetts until 2006. ................................ 46

    PREMIER CAPITAL LLC was not registered to do business in Massachusetts when it sued Plaintiff
    on the 2002 debt.................................................................................................................... 46

    Defendants have perpetuated a falsehood that Premier Capital, LLC and/or..................................... 47

    Premier Capital LLC are legitimate companies lawfully registered to do business in Delaware and
    Massachusetts, when neither is the case............................................................................... 47

    Defendants Have Used Litigation as a Racketeering Weapon............................................... 48

    THE ENTERPRISE ENGAGED OR AFFECTED INTERSTATE COMMERCE .................................. 51

Causes of Action.................................................................................................................... 56

    COUNT 1     18 USC § 1962(a) Racketeer Influenced Corrupt Organizations Act ............................ 56

    COUNT 2     18 USC § 1962(c), Racketeer Influenced Corrupt Organizations Act............................ 58

    COUNT 3 18 USC §1962(d) - Conspiracy to Engage in a Pattern of Racketeering Activity ............... 58

    COUNT 4 MAIL FRAUD 18 USC §1341 ............................................................................... 59

COUNT 5 WIRE FRAUD, 18 USC § 1343 ........................................................................... 60

COUNT 6 FAIR DEBT COLLECTION PRACTICES ACT (FDCPA) 15 USC §1692, ET SEQ ............ 61

COUNT 7 18 USC §1957  ENGAGING IN MONETARY TRANSACTIONS IN PROPERTY ............. 61

DERIVED FROM SPECIFIED UNLAWFUL ACTIVITY ...................................................... 61

COUNT 8 EXTORTION ............................ ...................................................................... 62

COUNT 9 CONSPIRACY TO COMMIT EXTORTION ........................................................... 62

COUNT 10 FRAUDULENT OMISSIONS/NONDISCLOSURE ............................................... 63

COUNT 11 FRAUDULENT MISREPRESENTATIONS ........................................................ 65

COUNT 12 CONSPIRACY TO COMMIT MAIL FRAUD ....................................................... 66

COUNT 13 CONSPIRACY TO COMMIT WIRE FRAUD ...................................................... 67

COUNT 14 CONSPIRACY TO COMMIT FRAUD ............................................................... 67

COUNT 15 AIDING AND ABETTING FRAUD .................................................................. 67

COUNT 16 DECEPTIVE TRADE PRACTICES ................................................................. 68

COUNT 17 UNJUST ENRICHMENT .............................................................................. 68

COUNT 18 CONVERSION ........................................................................................... 69

COUNT 19 CONSTRUCTIVE TRUST ............................................................................ 70

COUNT 20 UNFAIR TRADE PRACTICES – G.L. CHAPTER 93A, SECTIONS 2 AND 9 ................. 70

COUNT 21 PIERCING THE CORPORATE VEIL ............................................................... 71

COUNT 22 INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ................................. 72

COUNT 23 WILLFUL NEGLIGENCE ............................................................................. 72

PRAYER FOR RELIEF ..................................................................................................... 73

Plaintiff J GRAHAM ZAHORUIKO (pronounced, "za-re-co") ("Plaintiff," "Graham" or "Mr. Zahoruiko"), complains and alleges, upon information and belief, as follows:

## SUMMARY OF THE CASE

1.     Plaintiff, an American citizen and small businessman, seeks the protections of the federal court to sanction named Defendants: RICHARD GLEICHER,; THOMAS H. CURRAN; JOHN D. CUMMINGS, Jr.; JOHN P. BOWEN; CHRISTOPHER K. PFIRRMAN; NICHOLAS J. MAIMONIS; PREMIER CAPITAL; PREMIER CAPITAL LLC; PREMIER CAPITAL LLC a Delaware Limited Liability Company; PREMIER CAPITAL LLC a Massachusetts Limited Liability Company; PREMIER CAPITAL, LLC; PREMIER CAPITAL, LLC a Delaware Limited Liability Company; PREMIER CAPITAL, LLC a Massachusetts Limited Liability Company; PREMIER CAPITAL LIMITED LIABILITY COMPANY; PREMIER CAPITAL LIMITED LIABILITY COMPANY, a Delaware Limited Liability Company; PREMIER CAPITAL LIMITED LIABILITY COMPANY, a Massachusetts Limited Liability Company and SANTANDER BANK (formerly Sovereign Bank) for their civil "Racketeering" activities, which have damaged the lives and livelihoods of Plaintiff, and presumably, several dozen other American citizens around the United States who were targeted as PREMIER CAPITAL's victims.

2.     For the past 20 years, Defendants have managed to fool judges, state officials, banks, and their victims, around the country, that among other functions, they are legitimate debt collectors; their business may be a legitimate debt collection business, but the means they use to do their jobs are extortionate and illegal.  These men work in concert to back up each others falsehoods, by corroborating each other, without providing any objectively legitimate documentary evidence that confirms that they are telling the truth. Their scheme also involves using the oppressiveness of the courts in forcing debtors to arbitrarily derive sums owed,

sometimes ignoring debts already paid, to get as much money as possible to feed their RICO enterprise.

3.   Plaintiff introduces the gravamen of the instant cause of action by recounting Defendant RICHARD GLEICHER's admonition to small businessman Plaintiff's then attorney, Howard B. D'Amico, Esq., about why Defendants were so relentlessly pursuing Plaintiff to disgorge monies that Plaintiff allegedly owed their enterprise:

> [Plaintiff] has a promising future and we will continue to pursue [him] before, during or after bankruptcy as we feel it's a good bet on our part.

4.   Defendant RICHARD GLEICHER,  has proven only partially true to his word, in that Defendants have only partially destroyed Plaintiff's future, by relentlessly concocting schemes to extract money from him to support their unlawful activities, which is why Plaintiff brings this private civil action under the Racketeer Influenced and Corrupt Organizations Act, 18 USC §§ 1961, 1962, and 1964 and other common law claims.

5.   This complaint derives from Plaintiff's frustration at Defendants' ability in other pending legal matters, using deceit, lies, and falsehoods, in exerting unbearable pressure to extort a corporation by holding its President hostage. Although this is not a kidnapping case, per se, it is a kidnapping of sorts.  Defendants have managed to commit reprehensible and overbearing fraudulent acts to pierce the veil of a corporation, in order to collect a debt without proof of the debt. Defendants have proven to be exceptional in their ability to disregard the separateness of corporate entities to extort money from the individuals in the corporation, obviating the very corporation's purpose to limit liability and foster investment in corporate enterprises.  The Defendants, who appear to be stateless, themselves, have not read the memo that piercing is done only in rare and particular situations to prevent gross inequity.

6.   This litigation is also borne of Plaintiff's nagging suspicion over the last 12 years that the debt collecting practices of a legitimate debt collection company have been hijacked by racketeering individuals who have literally gotten away with taking hundreds of thousands (and

likely millions) of dollars from their victims, all based upon a belief that they can walk into any court claiming they have a right to hound a defaulter, whether they have proof of title and an assignment of their rights to collect the debt or not. Plaintiff, without an ounce of temerity, brings this action against a "fraternity of racketeers" who have been doing business with each other for over 20 years, intentionally making life a misreable hell for countless victims of their unlawful activities.

7.   Plaintiff does not dispute a debt collector's right to perform its, his, or her job; rather, plaintiff brings this cause of action to assert that this cadre of officials named herein have hidden behind their corporate guises to work concertedly, conspiratorially, and cooperatively as a racketeering enterprise, calculated to use subterfuge to accomplish their debt collection objectives. The extent to which they will fabricate documents, perjure themselves in notarized documents, or even testify falsely, in official proceedings is a black mark on our banking and debt collection practices, which illegal acts undermine small businesses, homeowners, our economy, and nation, as a whole.

8.   The individual persons named, RICHARD GLEICHER, THOMAS H. CURRAN, JOHN D. CUMMINGS, JR., JOHN P. BOWEN, CHRISTOPHER K. PFIRRMAN, and NICHOLAS J. MAIMONIS, have conspired to and have successfully committed several racketeering predicate acts, including, but not limited to: Conducting extortionate credit transactions [18 USCS §§ 891 through 894]; Mail fraud 18 USCS § 1341; Wire fraud 18 USCS § 1343; Interference with commerce, robbery, or extortion, 18 USCS § 1951; Laundering of monetary instruments, 18 USCS § 1956; and Engaging in monetary transactions in property derived from specified unlawful activity, 18 USCS § 1957.

9.   These predicate acts, in their combined totality, show a pattern of racketeering, namely, a concerted effort by Defendants to take drastic illegal measures to harass Plaintiff and other debtor-victims throughout the United States - for assignments to collect debt from banks seeking to get debt off of their books - and for which they can mysteriously, rarely

provide any tangible proof. Instead of providing the evidence to give them credibility, these debt collectors, would finagle, weave, extort, cajole, and use every trick in the book to make individual officers of the corporations look like liars and deadbeats - because their corporations were going through difficult times.

10.  The named defendants are involved in a truly sinister, hubristic, labyrinthine network of associations with each other in different business ventures, almost all of them of questionable legitimacy.  The named defendants use each other to shore up each other's business schemes by validating documents, investing or protecting each other's assets, and in Plaintiff's case, among those other schemes, worked concertedly to collect debts, without any tangible, legitimate-looking document or piece of paper as proof of any assignment to them, entitling them to collect the debts.

11.  Whereas American citizens and residents are required to show certified proof - of driver licenses, education (diplomas, degrees), licenses and certificates of marriage; trash dumping and residential parking permits, and passports--to substantiate their rights to conduct activities, it  would appear these racketeering debt collectors had no such obligation.  These Defendants have committed a ruse upon everyone, claiming, belligerently, that they legally owned the right to collect the debt because 1) the debtors were defaulters and 2) because Defendants said they had the right to collect the debt.  Rather than provide the documents to evince their alleged title an/or assignment entitling the racketeers to collect a debt, instead, Defendants would manufacture the proof (somethmes years later) necessary to back up each others' claims, which involved having a banking insider provide the alleged proof via a poorly sworn affidavit, without any specific facts regarding Plaintiff's case - and nothing more.

12.  Defendants are fraudsters, but wrap themselves in the cloak of their corporate guise to make it appear that they are merely employees, doing their jobs.  The corporate defendants lawyers may be licensed lawyers, but their legal arguments on behalf of the fraudsters also require a good faith belief that their clients are whom they claim to be.  The lawyers involved in

this scam are either highly incompetent or they are part of the fraud. Plaintiff asserts that, considering the abilities of the attorney(s) in this case, lawyers are supposed to corroborate, not merely parrot what their clients tell them, especially if these matters are civil in nature. In the case of Defendants, however, no questions were asked by the lawyer(s) because they knew that they were representing a criminal racketeering organization.

13.    Instead of confessing their own sins, Defendants make a living impugning every other defendant defaulter with Defendants' sinister motives, and ignore the very fact that corporations are entitled to have a separate and distinct liabilty than those of its officers.

14.   Defendants do not care about the law--they never have. Instead, they walk into court with a self-righteousness that money owed is always money that belongs to them, without any proof of the right to it; in no other profession is this acceptable, and where livelihoods, and literal lives, are at stake, it is an abomination.

15.   Defendants use legal strong-arm tactics, of a personal nature, designed to make their victims relent to their illegal tactics of persuasion. Instead of putting the proverbial gun to Plaintiff's head, these racketeers attached his personal home, threatening to make him homeless. Instead of respecting the protections that corporations are most always afforded, Defendants ignored the formalities of the corporeal entity, even if it operated like a corporate entity, and used tactics to pummel the corporation's President into submission. PREMIER CAPITAL, LLC would force Plaintiff's facts to suit its "members" own concocted definitions of small business debtor:  someone they can terrorize into signing a personal note against his home for corporate debts that should never have been pierced as personal debts.

16.   As further proof of the racketeering organization, Plaintiff will show how the debt collectors intentionally changed their debt collection practices when a pending case in Massachusetts was being decided regarding whether PREMIER CAPITAL, LLC, could pursue a defaulter to collect a debt, without proof of the assignment claimed by it. The facts in that case were very similar to Plaintiff's, and involved the same litigant, PREMIER CAPITAL, LLC.

That case, In re Gavin, 319 B.R. 27 (Boston, MA and Worcester, MA), involved Gavin, a bankruptcy candidate who challenged PREMIER CAPITAL LLC's right to collect on a judgment without any proof of a Fleet Bank-assignment of debt to PREMIER CAPITAL, LLC.

17.  The above-mentioned Gavin decision was pending on or about the time that Defendants were pursuing Plaintiff's company, Refresh Software Corporation, to pay its alleged debts.  In Plaintiff's case, however, Defendants pressured Plaintiff into signing a whole new promissory note as personal guarantor of his company, by attaching his home. Essentially, Defendants trumped up a new way to ensure they could go after Plaintiff with impunity by creating a whole new contract to sue upon, rather than the original Agreement claimed to be owned by them via the purported Fleet Bank-to-Sovereign Bank, then Sovereign Bank-to-Premier Capital LLC purchase & sale and assignment.

18.  To deflect attention away from the fact that they had no legal proof of their rights to a title and assignment, Defendants have pursued a scorched earth attack on Plaintiff's character, distorting facts, tacitly characterizing him as a liar and deadbeat, which could not be more further from the truth.  It is precisely because Plaintiff operates within the law that Defendants are seeking to destroy him.  Rather than see Plaintiff receive the protections afforded legitimate businesses in default, these illegitimate racketeers, instead, use shocking tactics such as seizing homes, to force him to bow to their unlawful and illegal objectives.

19.  Another ploy used by Defendants is to charge into court at every opportunity, alleging Defendants' wrongs, overshadowing their own deficiencies.  In fact, Defendants have used the courts as a weapon to control the debate surrounding the rights of the respective parties.  They have used every procedural motion in bankruptcy court to prevent Plaintiff's truth from being told, instead leaving the courts to believe that the parties had an arms length relationship to pay a debt; what they refuse to allow Plaintiff to divulge is that Defendants proverbially twisted and distorted the truth by bullying and coercing him through extortionate means, such as

attaching his home, creating documents from thin air, and hounding him, with the goal of getting him to cry uncle.

20.   When Plaintiff did cry uncle and make payments, they found another way to beat him down--by using a technicality to go after him for the original debts, charging him more money all over again: because, like Defendant RICHARD GLEICHER, said (not like a debt collection company, but a gambling racketeer):

[Plaintiff] has a promising future and we will continue to pursue [him] before, during or after bankruptcy as we feel it's a good bet on our part.

## THE PARTIES

21.   Plaintiff J GRAHAM ZAHORUIKO (Ex. 1: Affidavit) is a citizen of the United States, who was born and raised in New Hampshire and Massachusetts, and has lived in the State of Massachusetts most of his life. He chooses to bring this action in Massachusetts because it is the locale where evidence and witnesses are located, and where all the Defendants reside or have offices.

22.   The Defendants, PREMIER CAPITAL; PREMIER CAPITAL LLC; PREMIER CAPITAL LLC a Delaware Limited Liability Company; PREMIER CAPITAL LLC a Massachusetts Limited Liability Company; PREMIER CAPITAL, LLC; PREMIER CAPITAL, LLC a Delaware Limited Liability Company; PREMIER CAPITAL, LLC a Massachusetts Limited Liability Company; PREMIER CAPITAL LIMITED LIABILITY COMPANY; PREMIER CAPITAL LIMITED LIABILITY COMPANY, a Delaware Limited Liability Company; and PREMIER CAPITAL LIMITED LIABILITY COMPANY, a Massachusetts Limited Liability Company are a loose association of individuals who appear to be indirectly associated with a parent company, Premier Capital, Inc., the latter which is not a part of this cause of action. Premier Capital, Inc., to Plaintiff's best knowledge and belief, is not a part of the racketeering enterprise alleged herein, as it appears

to be a legitimate company, first registered in Massachusetts, in 1993, and appearing, continuously to have been in business ever since.

23. Some of the officers of Premier Capital, Inc., are temporally related to individuals who do comprise part of the of racketeering associations-in-fact, but those officers do not appear to be bound up in the PREMIER CAPITAL, et al entities, named as Defendants, herein, all of which have provided "cover" for the racketeering individuals to carry out their schemes. Defendants intentionally confuse the identities of the companies by choosing to use a comma or not use a comma after the name, "Capital," and further obfuscate matters by spelling out the suffix, e.g., PREMIER CAPITAL, LLC. These companies are completely separate companies, of, essentially, the same name, but are distinguished by the defendants for a strange or nefarious purpose only known to them.

24. What is important for the court to know is that the corporate defendants have a history of not being registered during critical time periods involving the instant case. In fact, there is no registered company in Massachusetts nor was there every a registered company named PREMIER CAPITAL LLC (sans comma) in Massachusetts, although Defendants have been operating here since the 1990s. PREMIER CAPITAL LLC (sans comma) has been defunct in Delaware since 1999. At the time of this filing, only the PREMIER CAPITAL LIMITED LIABILITY COMPANY (spelled out), organized in Delaware in 1999, has been registered in Massachusetts, since 2006; yet, it only claimed to be a part of this case since litigation commenced. In other words, these defendants use "shape-shifting" corporations that move in and out of Defendants' case, at their will.

25. Defendant RICHARD GLEICHER, a Massachusetts resident, is a debt collector, and debtor against whom the Court of Appeal for the First Circuit found a "confluence of several badges of fraud, constitut[ing] conclusive evidence of an actual intent to defraud." In that case, FDIC v. Anchor Properties, 13 F.3d 27, 28, 1994 U.S. App. LEXIS 68, 1 (1st Cir. Mass. 1994), the federal appellate court declared RICHARD GLEICHER, conduct in disposing of assets

from creditors to be a flagrant fraud: ["... appellant's transfer of his sole unencumbered asset to a trust of which he was trustee and his father the beneficiary, without consideration and in the midst of a rapidly deteriorating personal financial situation, the court could only conclude the transfer was fraudulent."].

26. Although sharing this highly negative history of RICHARD GLEICHER, is certainly prejudicial, it is presented here as being more probative of a his mindset as a debt collector. The checkered history of personal litigation in which RICHARD GLEICHER (Ex. 2), has been involved is crucial to understanding the motivations by which he wreaks havoc on everyone whom he suspects to have the same ill-intentions as he was adjudicated to have harbored. He seems to have a vengeance against anyone who appears, in his mind, to be running from a debt--as he tried to do--unsuccessfully. His mean-spiritedness drives him and his co-defendant henchmen to hound people personally, by adding more fees for late payments, or demanding the debt in full, even after most of the debt has been paid. Then they harass clients by bullying them in court, and making them spend even more money to hire attorneys to represent them.

27. Besides his attorney, co-Defendant THOMAS H. CURRAN (see below), Defendant RICHARD GLEICHER, appears to be the most visible or public face for the above-referenced "Limited Liability" and "LLC" and ",LLC" suffixed companies. RICHARD GLEICHER, is a debt collector who feels very comfortable on a witness stand and in a courtroom. He has instituted or defended against numerous court cases, as he makes it his mission to use the courts as both a sword (with which he maims his defaulting victims, hounding them into penury), and a shield, on behalf of his alleged employer. Righteously, like a good debt collector would do, he tracks down every single asset someone owns to satisfy a debt. However, unfortunately, RICHARD GLEICHER has shown a propensity for fabrication in all aspects of this cause of action, and his conspiring co-racketeers aid and abet in their collective objective to extort debt even more payments that might not even be owed.

28. Defendant JOHN D. CUMMINGS, Jr., is a Massachusetts resident with direct ties to the various entities that form the racketeering scheme. He lists himself as Manager of PREMIER CAPITAL Limited Liability Company (which is distinguished from "PREMIER CAPITAL LLC)," in its Certificate of Organization filed with the Secretary of the Commonwealth Corporations Division (MA), the certificate that was used to register as a Foreign Limited Liability Company on March 3, 2006.

29. Defendant SANTANDER BANK (formally Sovereign Bank), is the employeer of co-Defendants JOHN P. BOWEN, and CHRISTOPHER K. PFIRRMAN, who, while employed with Sovereign Bank, committed various co-conspiratorial acts with PREMIER CAPITAL, LLC co-racketeer RICHARD GLEICHER. These employees also purported to assign loans to PREMIER CAPITAL, LLC and the bank should have originals of said loan documents in their possessions. Allegedly, the bank was also involved in selling its debt. Sovereign Bank letterhead was produced by Defendants' on a Loan and Purchase Agreements which states on its face that its customers (such as Refresh Software Corporation), could have possiblly been in forbearance, at the time the debt was allegedly transferred.

30. SANTANDER BANK (formally Sovereign Bank) also turned a blind eye to the sketchy history of PREMIER CAPITAL. Basic due diligence would have unearthed the fact that the company had no right to be doing business in Massachusetts at the time of the alleged Assignment. Furthermore, SANTANDER BANK's predecessor, Sovereign Bank, provided no notice to Plaintiff's corporation, Refresh Software Corporation that it was selling its loan portfolios to a third party debt collector.

31. Plaintiff contends that the bank was negligent in allowing their employees to use their positions as bankers to perpetrate frauds against innocent persons who were in default, but which had been permitted a forbearance, because Plaintiff was in touch with the bank regularly updating officials as to Refresh Software Corporation's financial circumstances. Defendant SANTANDER BANK (formally Sovereign Bank) was negligent in coralling all debtors in the

same circumstances, causing PREMIER CAPITAL, alleged assignee of the banks debt, to take extralegal means to recover the debts of a legitimate corporation.

32. Defendant JOHN P. BOWEN, assumed to be a resident of Massachusetts and/or Rhode Island, is a crucial co-conspirator to the racketeering enterprise, as he gives legitimacy to the RICO organization's alleged mandate to collect Sovereign Bank's debt. An employee of formely-named Sovereign Bank, JOHN P. BOWEN, serves as the de facto recordkeeper of the bank's documents, at least as far as PREMIER CAPITAL is concerned. He is presumed to have an institutional history (otherwise known as an amazing memory) of all assignments of bank loans, or credit default swap transactions for which he never presented documents, but whose legitimacy he usually always attested to under oath. He produces affidavits to attest to facts and events that allegedly occurred for which he provides no direct evidence, e.g., bank records that, arguably, are, or should be kept in the normal course of business. He is the key to the misery of a myriad number of innocent defaulters, who have claimed, in accompanying affidavits, that Bowen's documents and his use of his lofty position was actually used by him to commit a fraud upon the courts.

33. Defendant CHRISTOPHER K. PFIRRMAN, a resident of Massachusetts, also, is a crucial contributor to the racketeering enterprise, who, as a bank official gives legitimacy to JOHN P. BOWEN, acts as an officer of Sovereign Bank. CHRISTOPHER K. PFIRRMAN, alleged signature is affixed to a document entitled, "Sovereign Bank Assistant Secretary's Incumbency Certificate," which certifies that JOHN P. BOWEN, is:

duly authorized and directed to take all such actions and do all such things necessary on behalf of Sovereign Bank as he in his discretion deem necessary or desirable consistent with the office to which he is elected, including but not limited to executing documents on behalf of Sovereign Bank.

34. The document lists JOHN P. BOWEN, "Functional Title," as "Recovery Officer," next to his Corporate Title, listed as Vice President." (Ex. 3). CHRISTOPHER K. PFIRRMAN, is now Executive Vice Preisdent and Chief Counsel SANTANDER BANK (formally Sovereign

Bank). This document is a de facto blank check authorizing JOHN P. BOWEN, to use his position however he deemed fit, something he did, on behalf of a racketeering organization of which Pfirrman apparently knew he was a part.

35. Plaintiff asserts that SANTANDER BANK (formally Soverign Bank), was willfully negligent of its Sovereign Bank is liable under the theory of respondeat superior because its employee, JOHN P. BOWEN, was doing work

36. Defendant NICHOLAS J. MAIMONIS, a resident of Massachusetts boasts, on a website, his "Bachelor's Degree in Sociology with a concentration in law," from Brandeis University, and lists his occupations as Collections Officer for Harbor One Bank and former Vice-President, Consumer Collection Manager for Admirals Bank. Plaintiff contends that, he, too, wrote affidavits attesting to facts in Plaintiff's case which were in error or were wholly false, but that NICHOLAS J. MAIMONIS, tends to gets away with it because he has the title of Debt Collector (Ex. 4).

37. Defendant THOMAS H. CURRAN, is an attorney, who has his own checkered history of being sanctioned by the courts for engaging in conflicts of interests, in a matter directly involving his PREMIER CAPITAL affiliated client(s). The fact that this attorney would even sanction the type of operations run by these racketeers suggest that he condones their behavior. Curran has also proven to be less than ethical in his dealings with another attorney, namely, Plaintiff's attorney, Timothy Mitchelson, whose request for some more information and time to deliberate over a settlement resulted in THOMAS H. CURRAN, bringing a whole new cause of action against Plaintiff.

38. This litigation will also seek, in discovery, to ascertain the identities of individuals and/or entities who have also engaged in racketeering acts in concert with the above-named, and may seek leave of court to add additional Defendants to this cause of action, such as other lawyers of Defendants, and other alleged Vice Presidents of PREMIER CAPITAL, whose names appear on documents, but whose connection to the instant case is still to be

Complaint: J GRAHAM ZAHORUIKO v. PREMIER CAPITAL, et al          15

determined.   Plaintiff contends there are several witnesses within the court's jurisdiction who may be willing to provide more information about the nature of Defendants' alleged scams.

## JURISDICTION AND VENUE

39.   This honorable court has subject matter jurisdiction over diverse claims arising under a federal question, namely, the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 USC § 1961 *et seq.,* and specifically rely upon § 1965(d), which allows service of process on any person, nationwide, in a racketeering enterprise, in any judicial district in which such person resides, is found, has an agent, or transacts his affairs.

40.   Venue is proper, under 28 USC § 1965(d), because the defendants do business or are located within this court's judicial district, and their officers and agents transact their business affairs in this court's district in a continuing manner.

## SUMMARY OF FACTS

41.   Plaintiff has been a businessman since the age of 8. He started his business when he turned a neighbor's request to shovel snow during the winter, into a thriving lawn maintenance business, which years later turned into a landscape and lawn sprinkler installation business. His eventual company employed between 20 and 100 people, seasonally, while he was still in his late teens and early twenties. Although Plaintiff took several college courses after graduating from high school, because business was booming (he had successfully convinced major construction companies and large commercial clients to hire his company) his loyalty to his employees and customers trumped college; he didn't even acquire enough credits for an associates degree.

42. When the information technology industry started booming in the 1990s, Plaintiff, flush with his earlier business success, sold the landscaping business and decided, at the age of 25, to use the sale proceeds to jump on the "dotcom" bandwagon. In 1995 Plaintiff created a Web development services company, SpaceNet Corporation, later re-named SpaceWeb Corporation, and then later changed to Refresh Software Corporation (see Refresh Case Studies, Ex. 5). The software company designed and sold, "SiteRefresh, or SR2" software that allowed businesses to update their Web sites without the need of hiring information technology (IT) personnel. The company eventually secured several Fortune 2000 businesses as clients, and the outlook in the late 1990s was looking bright (Id.).

43. On or about May 27, 1998, then SpaceWeb Corporation, applied for a Fleet Bank Business Credit Express Line of Credit for $10,000. Months later, on November 6, 1998, the business line of credit was approved for a credit limit of up to $50,000, an increase from the existing business loan (number 0000622803). The approval letter from Fleet Bank expressed that it hoped that the line of credit would be a "valuable resource for Refresh Software's business funding needs" (Ex. 6).

44. The interest rate for the line of credit was a "floating rate based on Fleet Bank's Prime Rate plus an initial Margin of 3.75 percentage points. The margin was subject to change after one year. The effective rate at the time period was 11.75% (Ibid).

45. The Fleet Bank Line of Credit Agreement, in a clause titled, "10. Assignments, Participations, and Securitizations," in sum, required Plaintiff's agreement that the bank had the right to sell all or any portion of the Loan, and that "[in] connection therewith, the Borrower hereby irrevocably authorizes the Bank to deliver to each purchaser, participant, investor and prosepective purchaser, participant and investor *originals and copies of all Loan Documents and all financial statements and other credit and factual data ... in the Banks possession which relate to the Borrower and/or all guarantors of the loan* (*italics* supplied)."

46.   During the next year, SpaceWeb Corporation was seeking ways to improve its market position by developing its software platform, and it applied to Fleet Bank for financing.  The request was declined because the business revenues were not sufficient. The bank did, however, offer SpaceWeb Corporation a "Business Credit Plus Line of Credit" with a credit limit of $59,000. The interest rate for the line of credit was a "floating rate based on Fleet Bank's Prime Rate plus an initial Margin of 4.00 percentage points.  The margin was subject to change after one year. The effective rate at the time was 11.75% (Ex. 6).

47.   Unfortunately, SpaceWeb Corporation was slightly too early at expansion attempts which were not propitious, because the whole dotcom bubble was just beginning to expland. On May 26, 1999, the company made another effort to raise money to develop its software and asked for an increase in its Fleet Bank Busines Plus Line of Credit, this time for $100,000 (Ex. 6). The interest rate for the line of credit was a "floating rate based on Fleet Bank's Prime Rate plus an initial Margin of 4.00 percentage points.  The margin was subject to change after one year. The effective rate at the time was 11.75% (Ibid).

48.   Plaintiff recalls signing the Fleet Bank Line of Credit Agreement, which also, by its terms in clause 16, stated the following:

**Bank's decisional standards.**  To the extent the applicable laws require the Bank's actions or decisions under the Loan Documents to be conducted in good faith the term "good faith" shall be defined (using a subjective standard) as honesty in fact with regard to the conduct or transaction concerned based upon the facts and circumstances actually known to the individual(s) acting for the Bank and such requirement may be satisfied by reliance upon the advice of attorneys, accountants, appraisers, architects, engineers, or other qualified professionals.

49. Plaintiff was chagrined when Refresh Software Corporation was unable to make its payments. Plaintiff kept in touch via telephone with Sovereign Bank officials regularly to update them of Refresh Software's financial circumstances. Soon after, Plaintiff received a statement from PREMIER CAPITAL, LLC, that Plaintiff and Refresh Software owed $99,949.81. (Ex. 4) Plaintiff dug in deeper, trying to salvage his sinking ship.

50. While Refresh Software was in default, a fact which Plaintiff dutifully acknowledges, Plaintiff was shocked to learn that a company named PREMIER CAPITAL, LLC, with which he had never had any dealings, had served notice via sheriff that PREMIER CAPITAL, LLC had secured a court order to attach Plaintiff's personal home (See Motion for Ex Parte Real Estate Attachment and Reach and Apply Attachment, Ex. 7). Claiming that it had bought certain Fleet Bank accounts from Sovereign Bank on either June 18, 2002 or July 1, 2002, PREMIER CAPITAL, LLC, offered no other documentation except that which it divulged in its correspondence with Plaintiff (Ex. 7).

51. Although the letter lists a Certified Mail Receipt 7099 3400 0010 8708 4693, on its face, Plaintiff does not recall ever receiving said correspondence. Furthermore, the contents of the alleged mail did not look sophisticated enough to be taken seriously: the communication was not on a unique stationery with letterhead or trademark or other affixation to it to suggest that it came from a legitimate source. In other words, any person could claim to have a company by virtue of merely stating so on a piece of paper. Furthermore, presumably, a legitimate debt collecting company would have contacted Plaintiff via telephone also, to discuss the default situation..

52. In addition to erroneously attaching Plaintiff's personal home to secure a corporate debt, Premier attempted to intimidate Refresh Software Corporation's business clients, namely, Cabot Coach Builders, Inc., Gustin Partners, Ltd, and Northeast Health Systems, legitimate businesses whose addition into the litigation was calculated to oppress, embarrass, and

humiliate both Refresh Software Corporation, the company, and its President, with the goal of forcing them both to settle their way ouf of the lawsuit (Ex. 7).

53.  The language of the Reach and Apply portion of the Complaint used by PREMIER CAPITAL, LLC to sue Refresh Software's clients, was sloppily drafted, with sentences numbered out of sequence, as though cut and pasted from some other case. Justice Christopher J. Muse, and the Clerk of the Courts had the presence of mind to see through the charade and denied that portion of the request ("...Because Plff has failed to establish the actual obligation of the 3 Reach and Apply Defts, to the Deft in accordance with Mass Elec. v. Athol 391 MA. 685. (1984) DENIED).

54.  Only after Plaintiff's personal home was attached did PREMIER CAPITAL, LLC bother to introduce itself to Refresh Software Corporation's President. Without any advance warning, or good faith outreach to Refresh Software Corporation's President.  Sadly, all it had to show to attach Plaintiff's home was was a Fleet Bank Business Line of Credit Application executed by Refresh Software Corporation's President (Plainitff) - accompanied by an uncorroborated claim that the debt was assigned to it. Improbable however it seemed to Plaintiff, this marauding company, with pithy evidence, poorly executed documents, but lots of bravado, held the unfettered right to attach the company President's home.

55.  Not only were PREMIER CAPITAL, LLC's actions tortious, but they were also in violation of its obligations to Sovereign Bank, the alleged Assignee of Fleet Bank's debt. Interestingly, NICHOLAS J. MAIMONIS,  a PREMIER CAPITAL, LLC "Vice President," in an affidavit (Ex. 4), went through lengths to explain Plaintiff's alleged debt obligations to Fleet Bank, but provided no testimony about who he represented and what rights he and his employer had to even be involved in an attachment of a corporate officer's personal home for a corporation's debt.

56.  Not one PREMIER CAPITAL, LLC representative bothered to produce any evidence beyond his personal admission to explain how their employer had secured the rights to the

Complaint: J GRAHAM ZAHORUIKO v. PREMIER CAPITAL, et al        20

Sovereign Bank debt "on or about July 1, 2002." (Line 4, NICHOLAS J. MAIMONIS, Affidavit, Ex. 4).

57. Inasmuch as Section 4.4 Loan Files of an alleged Sovereign Bank Loan Purchase and Sale Agreement, specifically addresses the documents that were made part of the alleged loan assignments, it is noteworthy that PREMIER CAPITAL, LLC's officials elected to ignore that element of proof which should have been in their possession:

To the best of Assignor's knowledge and belief, the Assignor has concluded in the loan files reviewed by the Assignee copies of all of the Loan Documents in its possession and has not purposely excluded any documents or information for the purpose of misleading the Assignee.

58. This clause begs the question of why documents specific to Refresh Software Corporation's accounts with Sovereign Bank were never presented to Plaintiff as proof of PREMIER CAPITAL, LLC's bona fides. A car cannot transfer hands without title, which begs the question of how tens of thousands of dollars of debt can be assigned and acted upon—without one ounce of proof except the original loan purchase now two transactions past?

59. Once Plaintiff became apprised of PREMIER CAPITAL, LLC's claims of owning Fleet Bank's original debt, he hired an attorney to represent his company, as the loan was made for its use - not that of the Plaintiff personally. That outside assistance didn't have any effect on Defendants' modus operandi: they dug in their heels, again, claiming that they had a right to collect Sovereign Bank's debtors. A tentative settlement had been reached on April 11, 2003, but when Refresh Software's attorney asked for records without redactions from Defendants, Defendants filed a notice of default with the court. Such a tactic evinces the intricacies of the racketeering organization, which included not only PREMIER CAPITAL, LLC., but its attorney,

Complaint: J GRAHAM ZAHORUIKO v. PREMIER CAPITAL, et al          21

Defendant THOMAS H. CURRAN, who, instead of being an officer of the court, wielded the bat of his clients to beat their adversaries into submission (See Ex. 9).

60. PREMIER CAPITAL, LLC refused to settle the litigation unless Plaintiff guaranteed the Refresh Software Corporation's debt in a personal promissory note in the amount of $128,000 (despite the fact that the original obligation was only $100,000, and desipte the fact that PREMIER CAPITAL, LLC claimed it was owed only $103,023 less than a year prior) (Ex. 4).

61. The surprise tactic of filing a notice of default had the intended effect of settling the litigation, which, though filed against Refresh Software Corporation, originally was settled against Plaintiff personally. Defendants wanted their pound of flesh, and without any documents to show their entitlement to even one cent of Sovereign Bank's debt, they created a whole new contract, from thin air, that effectively erased the original one upon which they rode into town avenging, so valiantly, as an alleged assignee of Sovereign Bank. (Ex. 10) Now, Plaintiff really was indebted to PREMIER CAPITAL, LLC, a company about which Plaintiff knew nothing (and that heretofore never even existed because it had gone defunct in Delaware in 1999 – and was never owned by any of the Defendants) (Ex. 11), but to whom Plaintiff would personally be in hock for many years to come.

62. During the period between signing the note and falling into financial distress again, in 2005, Refresh Software Corporation had paid off over $20,000 of the note (Ex.12). However, in January 2005, things had taken a turn for the worse. Plaintiff began receiving letters informing him of his default status. On March 5, 2007, PREMIER CAPITAL LLC sent a letter via U.S. mail summing up the history of the Note, this time explaining that the Note and "accompanying loan documens were purchased by PREMIER CAPITAL, LLC, addressed Plaintiff and Refresh Software Corporation as the Obligor(s), in another form letter mentioning the October 3, 2001 "Note and accompanying loan documents.... purchased by PREMIER CAPITAL LLC (the Obligee") pursuant to a Loan Sale Agrement with *Bank of America*." (Ex. 13) (*italics* supplied).

However, Refresh Software Corpoation was told the note originated with Fleet Bank and was "supposedly" acquired through the Sovereign P&S dated either June 18, 2002 or July 1, 2002 (Ex. 29)

63. Refresh Software Corporation, to Plaintiff's knowledge, had never entered into any agreement with Bank of America; Defendants were being sloppy, yet again, using form letters, telling the same story to its other victims that it was assigned a debt (for which it could not probably provide documentary proof).

64. Oddly, this time the stationery letterhead, for the first time, mentioned PREMIER CAPITAL, LLC (with the comma), and unlike the other correspondence, acknowledged Refresh Software Corporation (instead of addressing Plaintiff as the personal debtor in all other earlier correspondence) (See Ex. 8) Plaintiff, in a letter drafted on company letterhead, explained that the company was falling under difficult times, but that it would try to make payments in a timely manner (Ex. 14). The company received no reply.

65. As yet a "second example" and further evidence of both its carelessness and duplicity, months later in correspondence dated November 26, 2007, PREMIER CAPITAL, LLC, addressed Plaintiff and Refresh Software Corporation as the Obligor(s), in another form letter mentioning the October 3, 2001 "Note and accompanying loan documents.... purchased by PREMIER CAPITAL LLC (the Obligee") pursuant to a Loan Sale Agrement with *Bank of America*." (Ex. 15) (*italics* supplied).

66. By March 7, 2008, (when in 2005 Refresh Software had already changed executive management), the company's new Chairman and President, Robert F. Angelo, and PREMIER CAPITAL, LLC's previous "Vice-President, now, alleged "Account Manager," JOHN D. CUMMINGS, JR., discussed a forbearance agreement. It is noteworthy that there was no mention of Plaintiff's personal guarantee in those communications between the companies' duly appointed representatives. Even the Reference annotation listed "Re: Outstanding

Obligation," giving every inference that the note belonged to the corporation, Refresh Software Corporation (Ex. 16).

67. Plaintiff recites the above to impress upon the court that the Forbearance Agreement terms proposed by PREMIER CAPITAL, LLC were negotiated with Refresh Software Corporation. No where in the Agreement was there any mention of J GRAHAM ZAHORUIKO. After badgering and harassing Plaintiff into signing a personal guarantee, now, PREMIER CAPITAL, LLC, seemed to have conveniently forgotten the earlier settlement agreement making Plaintiff personally responsible, conveniently shifting the debt collection back onto the corporation, where it belonged all along (Ex. 17).

68. Considering the ongoing financial difficulties the software company was having, ultimately, Refresh Software Corporation could not honor the forbearance schedule, which was even more onerous than the original terms: Premier Calital, LLC was still owed $111,879 through May 2008, despite Plaintiff having made payments of up to $62,000 (Ex. 12).

69. Refresh Software Corporation and Plaintiff requested an accounting to ascertain standard information that, inexplicably, PREMIER CAPITAL, LLC refused to divulge, such as how Refresh Software Corporation's payments had been applied against the alleged debts owed, but Defendant refused to profide an accounting and, instead, demanded that Refresh Software Corporation and Plaintiff execute the Forbearance Agreement or it would reinstitute a lawsuit against them for a breach of the payment obligation under the original Promissory Note and Guaranty (Ex. 10).

70. Refresh Software Corporation and Plainitff executed Forbearance Agrement terms that were quite onerous: Plaintiff was required to pay a "forbearance fee" of $5,000, and $2,400 per month beginning June 30, 2008, for 48 months. The whole billing schedules were perplexing, too, as Plaintiff never understood how PREMIER CAPITAL, LLC was keeping its payment balances and invoices current, factoring proper interest rates into account. For instance, from 2003 to 2012, no amortization schedules were ever provided.

71. After a couple of imminent million dollar deals with venture capitalists fell through, the company could no longer sustain itself and it went into default. Plaintiff, who had personally leveraged his home assets for $75,000 to put into Refresh Software Corporation, had invested 16 years of his life into the business, had gone months on many occasions without being paid - was devastated when the company was raided by one of its investors.

72. As a part of Defendants' strategy, Defendants try to wear down their victims through litigation tactics of filing actions that have the potential of further indebting Plaintiff. They are calculated to make Plaintiff reflect upon the cost of asserting his company's and/or his rights in light of the litigation firestorm Defendants operate to descend upon him on any and all fronts available. With the acquiescence of an attorney, who, allegedly is paid first, even before debts are applied to balances. Defendants have a sure thing: an inexhaustible litigation team ready to jump to its offense and defense, regardless of the merits.

73. The first action was brought in 2002 in Massachusetts Superior Court: MICV2002-04566; the action brought over the attachment on the home and subsequently alleged default, prompted sua sponte by THOMAS H. CURRAN, Esq. (Ex. 7 and Ex. 9). That case instigated a settlement and promissory note upon Plaintiff, personally, against Plaintiff, who under personal duress, protested, but relented on legal grounds of corporate inviolability, a legal issue ignored by the other courts.

74. After Refresh Software Coporation had paid Defendants $92,485 in debts (Ex. 12), and failed to make payments under a new Forbearance Agreement with PREMIER CAPITAL, LLC (still under protest by Plaintiff) (Ex. 17), PREMIER CAPITAL LIMITED LIABILITY COMPANY (an entirely different company), now using the suffix Limited Liablity Company (spelled out), instituted a lawsuit (Civil Action No. MICV2010 CV 02628), on July 13, 2010, against Plaintiff and Refresh Software Corporation in the Commonwealth of Massachusetts County of Middlesex Superior Court, to collect on the allegedly owed debt to enforce the Note, Guaranty and a Forbearance Agreement, which was enforced against Refresh Software

Corporation, but then when the prospects for money weren't forthcoming from it, back to Plaintiff. That case is pending (Ex. 18).

75. Meanwhile, on May 1, 2012, Plaintiff filed a voluntary petition for Chapter 13 bankruptcy 2012 No. 4:12-BK-41662 Judge Hoffman, and converted to a Chapter 7 proceeding on August 6, 2012. Defendants, as they are wont to do to seal the deal against its victims, pursued an Adversary Proceeding (No. 4:12-AP-04119 Judge Hoffman), where they could manipulate facts, and developed a skein of misrepresentations to make Plaintiff appear to be a conniving, lying, cheating degenerate, to effectively shut the coffin on their unwitting victims. Plaintiff's attorney, who conceded ineffective assistance of counsel in not heeding his an order for a joint pre-trial motion, forfeited Plaintiff's arguments, and Defendants' pretrial motion was accepted as gospel. Defendants lies prevailed, and unfortunately for Plaintiff, Judge Hoffman took the bait. The case is awaiting appeal.

76. Meanwhile the federal bankruptcy appeal is also pending in district court. No. 4:2013-CV-40142 Judge Young.

## DEFENDANTS CONDUCTED THE ENTERPRISE

### The Enterprise

77. Each Defendant is a "person" under 18 USC §§ 1961(3) and 1962(c). Defendants are a group of persons associated in fact for the common purposes of conducting the scheme described in this Complaint.

78. The named defendants are individuals with a common purpose, namely, they are employed as debt collectors. Defendant RICHARD GLEICHER's deposition testimony (Ex. 19) (RICHARD GLEICHER displayed a vehemently personal opposition to Plaintiff's bankruptcy), describing how their operation works, is worthy of verbatim repetition, as it proves several of the following enumerate factors that have been used in the First Circuit in

determining the existence of a RICO enterprise: (1) whether the associates have a common purpose; (2) whether there is systematic linkage, such as overlapping leadership, structured or financial ties or continuing coordination; (3) whether there is a common communication network for sharing information on a regular basis; (4) whether the associates hold meetings and sessions where important discussions take place; (5) whether the associates wear common colors, signs or insignia to make the group identifiable; and (6) whether the group conducted common training and instruction.

79. The sworn deposition (Ex. 19) was held on April 9, 2013, Plaintiff's then lawyer, Howard D'Amico, Esq., was the questioner:

3    Q. And, Mr. Richard Gleicher, who are you to Premier

4   Capital?

5    A. I'm a vice president with PREMIER CAPITAL, LLC.

6    Q. Okay. So explain to me a little bit where is

7   PREMIER CAPITAL based?

8    A. Wilmington, Mass.

9    Q. Okay. About how long has it been in existence?

10    A. I would say over 10 years.

11    Q. How long have you been with Premier?

12    A. Over 10 years.

13    Q. Were you there at its inception?

14    A. I was there since the beginning. I had -- I

15   don't believe I had much to do with the inception.

16    Q. Okay. Well, let's cover that.

17     Were you part of the organization of the

18   company --

19    A. No.

20    Q. -- at the beginning?

21    A. No.

22    Q. Okay. Are you an employee of the company?

23    A. Yes.

24    Q. Are you a shareholder or a member in any way?

0006

1    A. No.

2    Q. Okay. So you're purely an employee. And you're

3  an officer and vice president; correct?

4    A. I'm a vice president and employee, correct.

5    Q. Okay. Premier is an LLC; correct?

6    A. Yes.

7    Q. So who is -- who is the primary person in charge

8  of the operation of the business?

9        MR. ANTONELLI: Objection.

10        You can answer.

11    A. I don't know. I mean, it's very few people in

12  the office and everybody sort of takes part and does

13  what they have to do.

14    Q. Okay. Well, let's cover that.

15        When you say there are very few people in the

16  office, how many people are in the office?

17    A. Less than 10.

18    Q. Okay. And is there -- if you're a vice president

19  is there a president in this structure?

20    A.  Yes.

21    Q.  Who is the president?

22    A.  Paul George.

23    Q.  And is he one of the founders of the business?

24    A.  I don't know.

0007

1    Q.  Who do you believe were the founders of the

2  business?

3    A.  I have no belief whatsoever.

4    Q.  Were you at the company on day one at its initial

5  operation?

6    A.  Approximately, yes.

7    Q.  What do you mean by "approximately"?

8    A.  I came in, I got hired, and I've been working.

9    Q.  Well, you would have a memory I would think of

10  whether you were physically working the first day the

11  company was running.

12        MR. ANTONELLI:  Objection.

13    Q.  Is that your perception?

14    A.  I wouldn't have that kind of memory.  I just

15  don't.

16    Q.  But the day you started, do you have a perception

17  that that was also the day that the company started?

18    A.  No.  I walked in and there were people there.

19  There was a secretary at the front desk.

20    Q.  And that's my question.  Your perception is,

21   whether it was a day or 20 years, it was running before

22   you got there?

23     A.  Yes.

24     Q.  But your perception is also not very long before,

0008

1   six months to a year before at most?

2     A.  I don't know.

3     Q.  Could it have been 10 or 20 years before?

4     A.  It could have been.

5     Q.  All right.  So currently you said there's a

6   president; how many vice presidents?

7     A.  At least two.  Maybe three.

8     Q.  Okay.  And bear with me.

9        What are you president of?

10          MR. ANTONELLI:  Objection.

11          You can answer.

12     Q.  Do you have a title to the vice president of?

13     A.  No.  I'm just a vice president.

14     Q.  Okay.  And how about the other several vice

15   presidents?

16     A.  I -- I believe they're just vice presidents as

17   well.

18     Q.  Okay.  Do they have different functions than you

19   have?

20     A.  Slightly.  But I don't think meaningfully.

21     Q.  Okay.  All right.

22      Other than the president -- well, strike that.

23      Who do you report to?

24   A.  The president.

0009

1    Q.  Okay.  And how about the other vice presidents,

2   who do you think they report to?

3    A.  I believe they report to the president as well.

4    Q.  Do you have any perception of who the president

5   reports to?

6    A.  No.

7    Q.  Do you believe the president is the person making

8   all the decisions for the company?

9    A.  No.

10   Q.  You believe he reports to somebody, you just

11   don't know who he is?

12   A.  All the decisions that are made are -- major

13   decisions I believe are made collectively.

14   Q.  By whom?

15   A.  Different people.

16   Q.  As in who?

17   A.  Different people have been coming in and out of

18   the office for years.  I don't think you can classify

19   them.

20   Q.  How about today?

21   A.  Today?  Today I was making the decisions.  I was

22   the only person in the company.

23    Q. How about this -- how about from March of 2013,

24   who would you say were the people that would

0010

1   collectively be making decisions on behalf of the

2   company?

3    A. I guess it depends on the decisions that were

4   being made. But the bookkeeper, myself, John Cummings,

5   Mr. George. There may be another person making

6   decisions.

7    Q. Do you have essentially a committee that meets

8   from time to time to make decisions with regard to

9   operations?

10    A. On important decisions, yes.

11    Q. Okay. All right. Who would be on that

12   committee?

13    A. It's not a formal committee.

14    Q. Who would be on the informal committee?

15    A. Myself, Mr. George, Mr. Cummings.

16    Q. Anyone else?

17    A. It depends on the situation.

18    Q. Okay. All right. What does PREMIER CAPITAL do?

19        MR. ANTONELLI: Objection.

20        You can answer.

21    A. The best I can describe it they buy loans, they

22   service loans. I think that's pretty much it. Maybe

23   some fee income. They might do some third-party work.

24    Q. What do you mean by "third-party work"?

0011

1    A. Somebody might -- consulting.

2    Q. Give me an example of that.

3    A. Somebody might come in and say, "we would like

4    you to do something for us and we'll pay you for doing

5    that."

6    Q. Well, I understand the general concept of

7    consulting.

8    A. Okay.

9    Q. But specifically what might somebody at Premier

10   do?

11   A. I wouldn't know.  I'm just saying -- if you ask

12   me what's done.

13   Q. Yep. Yep.

14   A. Over the years it's a long time.

15   Q. Yep.

16   A. I'm getting older.  I'm sure a bank has come in

17   at some point and said, "we have this loan, we need some

18   work done."  And somebody says, "okay, we'll do this."

19   I might have worked on something.


80. Allegedly, the common purpose appears to be to decide to do whatever jobs are

offered them, including to collect debt. Plaintiff's affidavit explains the incestuous business links

between almost every person affiliated with Premier Capital, Inc.  They are tortuous branches

of a family tree of associations both scattered, and overlapping, depending upon the type of venture in which they endeavor.

81.   The titular legitimate leadership comes from Premier Capital, Inc., behind which the racketeers hide, doing their questionable works.  Inasmuch as the members of the racketeering organization pinch hit for each other to perform tasks for the other, there is an obvious communication structure that allows them to work in concert of whatever bad works. Although plaintiff believes the communications are all made via telephone or meetings, as RICHARD GLEICHER, explained above.

82.   The racketeers don't wear uniforms, but their documents all have the same mark of illegitimacy known only to them, as their bravura makes everyone believe they are legit.  Their bond is unassailable and would be laudable if their activities weren't such classic "*Goodfellas,*" or "*Sopranos,*" in style, without the bloodshed, although they leave bullets in the lives of their victims, proverbially, whose lives are shot to hell, where they needn't be.

83.   Defendants' reputations precede them, in the countless lives of Americans who have fallen under their sinister spell.  These defendants are toxic and a stain on debt collection companies whose jobs aren't salutary to the average debtor, but can be understood by most as being necessary.  Defendants' scheme to defraud required the use of subterfuge, manipulation, and cheating to secure their sought-after monies. Essentially, their operation involved going after conscientious, law-abiding Americans who may have fallen down on their luck, who had every intention of owning up to their obligations to the full extent of the law, but who Defendants could badger and goad, through the use of highly specious evidence, to attack their vulnerable victims.

## Predicate Acts

**Defendants' Overall Scheme to Defraud**

84.  Several of the predicate acts, listed below, involve a crucial element: a scheme to defraud.  Defendants' overall scheme to defraud was pervasive in all of their dealings, calculated to give the courts, litigants, and state officials the impression that they are part of a legitimate business enterprise.

85.  Whereas debt collection is a legitimate business, in the case of PREMIER CAPITAL and its affiliated, named entities, theirs is a legitimate scam because of the methods used by the co-conspirators to extract compliance from their victims.  They would use every caprice to win, mainly by ensuring that they could tag-team each other to provided the conspiratorial proof necessary to buttress what their forthrightness, notwithstanding, could not evince: that they were entitled to go after defaulters even without the documentation or proof of their legal right to do so.

86.  When glimpsed in their totality, Defendants can be seen for who they are: racketeers, defrauding not only American citizens but American banks, too. By selling their bad debt to collectors, banks are implicitly giving their imprimatur to their surrogates; as such it should be expected that debt collecting operations should be held to that higher standard, which keeps our banking system sound and our reliance upon it trusting. The average banker would not employ a man with brass knuckles to serve as a teller; Plaintiff asserts that banks would be less inclined to sell their debts if they knew that criminal acts were being perpetrated in furtherance of collecting them.

87.  What made it easiest for this racketeering enterprise was the participation of an insider, a banker, to wit, JOHN P. BOWEN, who could be counted on to fill in any missing link with an affidavit under oath that he had personal knowledge of whatever needed corroborating.

Essentially, Bowen's affidavit would say, "Whatever authority they said they have, I agree with them. I remember. And you can trust me: I'm a banker" (Ex. 20).

88.  With JOHN P. BOWEN on their team, Defendants could and did run into court, with an air of moral uprightness, honesty, fair play and right dealing in general, as businesses are wont to do, but their similarities with legitimate debt collectors ends there. The artifice they use is to make sure that Plaintiffs/victims are never given an opportunity to be treated as legitimate business debtors, as the law allows, and, instead, are forced to yield to their onerous collection demands under threats of homelessness and penury.

89.  Attached is an affidavit from a victim of PREMIER CAPITAL, LLC, who has his own hardluck stories about his dealings with Defendants (Ex. 21).  Plaintiff does not attempt to discourage debt collecting, as it is a legitimate profession and someone has to do it; however, Plaintiff contends that these Defendants do not belong in the business.  They have a cavalier attitude toward their legal obligations, even moreso because they have an attorney, THOMAS H. CURRAN,  who works alongside them, corroborating their illegal acts, filing Motions in Limine in adversary proceedings to prevent facts (that they desperately concoct from thin air) from being corroborated (Ex. 22).  Other members of the conspiracy serve as in-house notaries who rubber-stamp questionable documents. In effect, each person works, concertedly, to substantiate their companies' shady policies and deliberately deceptive actions, essentially, legitimizing them.

90.  The schemes to defraud dovetail with their racketeering patterns, calculated to exert overwhelming pressure: fabricating evidence, witnesses, and disregarding corporate formalities, which they themselves totally ignore themselves, in their own "corporate" [sic] operations, in assuming that everyone operates a sham business like they do themselves.

91.  Defendants' racketeering activities consisted of the following predicate acts, relating to:

## Conducting extortionate credit transactions [18 USCS §§ 891 through 894]

92.  The courts have determined that it is unlawful to use extortionate means to "collect or attempt to collect any extension of credit [18 USC § 894(a)(1)]," and have furthermore confirmed in United States v. Goode, 945 F.2d 1168, 1169-1170, that the legislation was

  directed to the use of extortionate means in order to collect monies which the creditors maintain are owing to them, regardless of whether the loan arose from a traditional type of loan or resulted from the assumption of responsibility as the result of force or threats.

93.  Plaintiff resorts to mention of United States v. Goode, 945 F.2d 1168, 1169-1170, excerpted above, to explain the rationale for Defendants' racketeering scenario used in his case. Essentially, Defendants exerted force upon his company, and pushed him, as President, into a corner. These defendants have exerted an unbearable amount of pressure to find fault where there is none and to find fraud to prevent Plaintiff's corporation from having the opportunity to  make a fresh start." Id.

94.  At no stage did Plaintiff ever deviate from his position that the corporate debt was not his personal debt, that the co-conspirators used the leverage of attachment to sidetrack him from exerting his rights, then "solved" his conundrom by offering him a personal loan, instead. Defendants' objective of using deception and urgency to deprive his company of pursuing bankruptcy, a federal statory right, forced him to take a step he felt he should not have to take. Plaintiff classically kept his business separate from his personal affairs, to such an extent that he did not give himself a meaningful salary.

## Mail fraud 18 USCS § 1341

95. Every correspondence from Defendants to Plaintiff sent through the US mails by Defendants was calculated to perpetuate the overall scheme to defraud, especially considering the fact that the company that was hounding Plaintiff was not even entitled to do business within the state of Massachusetts. Every correspondence to the court from Defendants also worked to defraud the courts, in making the court believe they had a legitimate claim of right to pursue Plaintiff's debt.

96. Defendants would send letters, with whatever corporate name the writer cared, usually under PREMIER CAPITAL LLC letterhead, but it was not on uniform stationery. It's obvious that the margins of the documents are different, the lines and other markings on the letters were not standard. Yet they dared use those letters to harm an individual, over and over again, by sending their missives through the mail. Each mail they sent constituted a mail fraud.

## Wire fraud 18 USCS § 1343

97. As described above, Defendants used the wires to communicate with each other concerning their schemes to defraud. Plaintiff asserts that they were always in communication with each other concerning operations. They would pick up the telephone to ask one of their co-conspirators to carry out his part of the scam, such as, notarizing a document, or coaching them how to assert a right. Discovery will unearth the extent of their communications with each other in furtherance of the racketeering scam.

## Interference with commerce, robbery, or extortion 18 USCS § 1951

98. Defendants, concertedly, and with great care, did everything they could do to obstruct Plaintiff's right to file for bankruptcy by attaching his home (Ex. 7), diverting his attention away from the right to file bankruptcy, to struggling to keep his home and securing a place to live.

This action by Defendants necessarily impacts commerce because, by attaching his home, Defendants forced an immediate injury upon Plaintiff.  By taking away Plaintiff's home, they did obtain his property, under color of official right, as debt collectors, notwithstanding that neither Defendants, nor their employees in 2002, had any legal authorization to do business in the state (Ex. 23 & Ex. 24) and had no documents to back up their claims of right to collect a debt as an assignee of Sovereign Bank.

99.  Defendants also impacted Plaintiff's company's ability to do commerce by contacting its clients and bringing causes of action against them, demanding that they make payments to them, instead of to Refresh Software Corporation, which caused those clients to sever ties with Refresh Software Corporation.

100. As "inheritors" of Sovereign Bank, a federal savings bank's right to collect a debt, Defendants' actions have had a profound effect on commerce within the state and in other states where Defendants concocted and acted upon the same general schemes in the same manner with other victims (Ex. 21).

### Laundering of monetary instruments, 18 USCS § 1956

101. Crucial to the racketeering operations was the involvement of JOHN P. BOWEN,  a Sovereign and SANTANDER BANK employee, who could always be counted upon to "save the day," by writing an affidavit, which, in *deus es machina* fashion, affirmed his supreme knowledge of whatever needed proof. His testimony was enough. His affidavits (Ex. 20) laid no foundation for his knowledge, no explanation for how he came into the information, or how he could remember the banking issue du jour for which his expertise was being offered. The affidavits related to purchase of debts by PREMIER CAPITAL, for which he would never attach a record (See Affidavits of Plaintiff J GRAHAM ZAHORUIKO Ex. 1 and Michael Truman Ex. 25).

102. Such actions by Defendant co-racketeer JOHN P. BOWEN, can be seen under the law to be a misapplication by a bank employee, under predicate acts 18 USCS § 656, and 18 USCS § 657, respectively, relating to lending, credit, and insurance institutions. By turning Plaintiff's debt into a promissory note, each conspiring Defendant became an unlicensed lender, it- or him-self, taking on the characteristics of a lending or credit institution, such as instituting forbearance actions, like a lending institution.

103. Every payment demand made by Defendants of Plaintiff constituted a money laundering transaction of a specified unlawful activity. Plaintiff's affidavit (Ex. 12) show the dates payment was made to PREMIER CAPITAL, LLC, for the sum of $92,485, a total of 52 payments. Payments were made via check with a makeshift payment stub sheet which was made by copier, and had to be cut with scissors, for mailing via United States Postal Service.

### Engaging in monetary transactions in property derived from specified unlawful activity, 18 USCS § 1957

104. Defendants raked in the money from Plaintiff and other victims, as that was a part of their racketeering scheme, and it helped to perpetuate their racketeering business. The financial transactions, themselves, were intended to promote the carrying on of their specified unlawful activity. Defendants' acts were designed, in whole or in part, to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful extortionate and other unlawful activities discussed throughout this Complaint. Each financial transaction involved the proceeds of their racketeering scheme, each of which was a dependent transaction borne of a single, conistent plan or arrangement to badger Plaintiff to pay on the promissory note they extorted from him in lieu of securing a judgment against Refresh Software Corporation, the true debtor.

## **DEFENDANTS' PATTERN OF RACKETEERING AND METHODS OF COMMISSION**

105. Defendants have filed questionable lawsuits throughought Massachusetts and other states, in proverbial broad daylight, while committing a ruse upon the courts and their victims that they, themselves are legit.  One important ploy that the enterprise uses is to deflect attention from its own illegality by finding fault with Plaintiff's actions that, in actuality, are a blueprint for how the illegal enterprise itself behaves. The brilliance of Defendants racket is absolutelly sinister and has made a mockery of the legal system in states throughout the union.

106. Defendants are like a football team that tackles an opponent which such ferocity that when the victim resurfaces, battered and bleeding, he is tackled again under the belief that because the first beating occurred, it must have been justified.  To use another metaphor, Defendants' modus operandi is like that of a murderer who makes the charge against someone else for the acts he perpetrates himself—and because of its specifics, is believed to be accurate and truthful. It is truthful, but applied toward the wrong perpetrator.

107. The Bankruptcy Adversary Hearing examination, by RICHARD GLEICHER  of Plaintiff, is worth a read in its entirety, an exercise is obfuscation and hubris, especially those portions of the questions dealing with Plaintiff's different corporations. At the hearing, Gleicher attempted to show how Plaintiff, the individual, was the responsible party, instead of the corporations for which he served as President, companies which were duly registered in Delaware and Massachusetts, unlike that of Defendants (Ex. 26). Plaintiff recalls in his affidavit how RICHARD GLEICHER, always sat righteously on a throne to lay bare the "frauds" of Plaintiff, which are frauds only because Defendants orchestrated it so: by piercing a legitimate corporation's veil without permission of any court, but through the harassment of their victim, they can now personally attack the individual, to cast doubt on every "personal" decision ever made by him.

108. In Plaintiff's case, they have thrown off the corporate veil of a legitimate company, as judge, jury, and executioner, then left the victim, proverbially, naked, exposed and bewildered. Afterwards, they charge into court trumping up any number of questionable examples of falsity, prevarication, or dissent by the victim, in a totally controlling setting, such as the adversary proceeding--to implicate him a liar. For the sake of metaphor, Defendants are a classic example of a murderer himself who prosecutes another for his or her crimes, and does so with such veracity. However real the acts may be, it is the scapegoated perpetrator who is false.

109. Plaintiff opines that RICHARD GLEICHER, who purports to be a mere employee, is the engine behind the racketeering enterprise, with a Manichean vendetta so callous and disrespectful of the truth, that it is almost bewildering to behold. Proven by the FDIC to be a fraudster, yet still allowed to do business with legitimate banks and to impugn the integrity of citizens ten-fold more honest than himself, he is almost a caricature of a racketeer. Plaintiff's affidavit explains how RICHARD GLEICHER takes personal joy in making Plaintiff fight for his economic livelihood, and therefore, his life, always smirking as he sits opposite him in court or in a bankruptcy creditor meeting (Ex 27). It is a bloodsport for RICHARD GLEICHER, or a form of absolution for his own sordid financial transgressions. In the Commonwealth of Massachusetts (Civil Action No. 95-5395); a deficiency judgment in Florida was upheld against RICHARD GLEICHER, in MA, for $214,638, executed on October 17, 2003, at the very time that RICHARD GLEICHER was pursuing Plaintiff for money (Ex. 2).

110. During the whole time Defendants were dealing with Plaintiff, attempting to expose his bad acts, it was RICHARD GLEICHER, et al, who are evading exposure.

### Intentionally creating confusing corporate names and identities

111. Defendants used identities such as "PREMIER CAPITAL, LLC," PREMIER CAPITAL, Limited Liability Company, "PREMIER CAPITAL LLC" (no comma) on its letterhead, different

corporeal entities, within the same state, a questionable practice for a company existing of

approximately only 5-10 or so employees. The specific title of the company apparently isn't

important, and distinctions between companies might hinge upon whether or not there is a

comma, a period, or an extra letter (Premiere v. Premier) in the names.

      a.  PREMIER CAPITAL Limited Liability Company

      b.  PREMIER CAPITAL LLC

      c.  Premier Capital, Inc.

      d.  PREMIER CAPITAL Management

      e.  PREMIER CAPITAL Companies, LLC (registered in California as a foreign

          company, registered in Delaware, although Delaware Department of State

          Division of Corporations lists no such company)

      f.   Premiere Capital LLC – File No. 3395621

      g.  Premiere Capital LLC – File No. 4579929


112. The above-listed company names were derived from the State of Delaware Division of

Corporation's records.  Plaintiff's search of license registrations at the Florida's Office of

Financial Regulations showed another 10 companies using the PREMIER CAPITAL

appellation, with other suffixes, such as PREMIER CAPITAL "Mortgage," or "Lending,

"Resources," etc.

113. Defendants' indiscriminate use of the different names for their businesses is a blatant

example of their penchant for intentional legal obfuscation.

**Defendants are affiliated in intricately financial personal and corporate dealings with
each other, serving on each other's Boards and Managing each other's corporations
throughout the country**


114. The members of the racketeering scheme are almost fraternal in nature as they

support each other's personal business dealings.  Plaintiff's Affidavit will show the

interconnectedness of all the defendants, exposing their enterprise and how they use each other to shore up their racketeering dealings.

115. For example, Plaintiff's affidavit will show how Lenders Trust, LLC, registered in Delaware in 2004, Massachusetts in 2006, and Vermont in 2008 lists the same address as the other PREMIER CAPITAL companies, 226 Lowell Street, Wilmington, MA 01877, and JOHN D. CUMMINGS, JR., serves as its registered agent.

116. Plaintiff will also show how RICHARD GLEICHER, is involved and/or otherwise affiliated with a plethora of other businesses: Harbor Financial Resources, Inc. (MA); Normandy Square Associates Limited Partnership (MA); Master Management Services, Inc. (MA); Anchor (MA) Properties, Inc. (MA); Anchor (NY) Properties, Inc. (MA); Anchor Properties Limited Partnership (MA); Info Funding Corp. (MA); Lenders Trust, LLC (MA); Lenders Trust, LLC (DE); Lenders Trust, LLC (VT); Langley 20 Realty Trust (MA); General Portfolio Properties, Inc. (NV); PREMIER CAPITAL LLC (DE); PREMIER CAPITAL LLC (MA); PREMIER CAPITAL, LLC (DE); PREMIER CAPITAL, LLC (MA), and Premiere Management, Inc. (MA) (note the "French" spelling for Premier, with the "e" on the end) and Premier Management, Inc. (MA) (Ex. 28).

117. Premier Capital, Inc., lists Paul George as President, Treasurer and Director with Clarance (Tony) J. Harwood, as its Secretary.

118. Defendants have convinced everyone that they are a legitimate debt collecting company, without any requirements to follow formalities required of a debt collector, such as proving of ownership of an assignment or right to collect a debt. Instead of providing bank records and statements to document their corporate claims, the same defendants RICHARD GLEICHER, THOMAS H. CURRAN, JOHN D. CUMMINGS, Jr., NICHOLAS J. MAIMONIS, work in tandem to provide legitimacy to each other, merely by stating the same claims orally and in writing.

119. JOHN P. BOWEN's importance to the PREMIER CAPITAL racketeering modus operandi cannot be understated, inasmuch as it was he who provided the corroboration to substantiate PREMIER CAPITAL's claims that it was a successor to Sovereign Bank's (JOHN P. BOWEN, employer) rights to collect on the debt. JOHN P. BOWEN's signatures on documents have no visible consistency, suggesting that anybody could have penned his name on the documents (Ex. 29). In addition, it would appear that he alone worked for Sovereign Bank, without any incentive to provide the evidence usually expected of financial institutions, and even stated in the terms of the Sovereign Loan Purchase and Sale Agreement as evidence worth maintaining. In the world of PREMIER CAPITAL, Defendant JOHN P. BOWEN,  need only make his oral pronouncement to suffice - in cases, for which he and others showed no proof.

**Defendants never provided Plaintiff-debtors advance notice of their claims to collect debt in writing, choosing instead to shock them by taking drastic actions such as seizing their homes, or re-instating an original debt on a minor technicality after substantial payment had been made already.**

120. Unlike how most corporations operate when dealing with each other, these Defendants never provided notice to Refresh Software Corporation of their intent to collect its debt, instead using extreme acts, such as attaching a corporate officer's home (Ex. 7). Such unprofessional tactics accentuate the personal and vindictive nature of their actions, instead of displaying how a legitimate company might act, e.g., seek to bring defaulting companies back into negotiations to discuss how to move forward. By using "shock and awe" tactics of summoning sherrifs to serve attachments, Defendants used their collective authority to badger a corporate officer, seizing his personal home, and creating more onerous notes. Furthermore, after securing Plaintiff's signature on a promissory note (by duress) (Ex. 10), Defendants would concoct more ways to find Plaintiff in further default, by creating new reasons for adding more debt to the equation. Plaintiff's affidavit recounts how many different accountings rendered

Complaint: J GRAHAM ZAHORUIKO v. PREMIER CAPITAL, et al          45

different amounts owed, none with any evidence to back the numbers up with any legitimacy.

The amounts owed were what Defendants said they were - that was enough.

**Defendants wholly disrespected the corporate formalities usually afforded corporations, by pursuing Refresh Software Corporation's President while PREMIER CAPITAL LLC - named companies totally ignored their own legal status during crucial time periods in question; The company was never registered to do business within the state of Massachusetts until 2006.**

## PREMIER CAPITAL LLC was not registered to do business in Massachusetts or any other state when it sued Plaintiff on the 2002 debt.

121. PREMIER CAPITAL LLC's Certificate of Formation for Delaware, registered in 1995, and defunct in 1999, describes its business as one that is not owned by Defendants but by an unrelated third party with no affiliation (Ex. 11). No such registration formalities were undertaken in the very state, Massachusetts, where most of their offices were located and where its business flourished.

122. Plaintiff has confirmed through the Massachusetts Division of Banking that at no time during its harassment of Plaintiff to collect the alleged Sovereign Bank debt, did PREMIER CAPITAL LLC have a license to collect a debt within the Commonwealth of Massachusetts (See Affidavit of Massachusetts Division of Banks General Counsel – Ex. 24). To restate, in 2002, when PREMIER CAPITAL LLC first seized Plaintiff's personal home and pursued Plaintiff personally, it had no authority to do so as a debt collector; nor was it qualified to issue the loan in the form of the new note that it coerced Plaintiff into accepting in 2003. In fact, PREMIER CAPITAL has still Never registered PREMIER CAPITAL LLC or PREMIER CAPITAL, LLC, whatsoever! In Massachusetts, and on March 3, 2006, years later a completely different entity called PREMIER CAPITAL LIMITED LIABILTIY COMPANY was rergistered in Massachusetts (Ex 11). This irony is worth stating: a company with no license to

do business mercilessly pursued a legitimate businessman, suing him personally for his corporation's debts, yet it hid under the fiction that it was a legitimate company. Again, RICHARD GLEICHER,  and company acted like businessmen, fooling the courts and their victims, securing hundreds of thousands of dollars from them—they were frauds, the whole time.

## Defendants have perpetuated a falsehood that PREMIER CAPITAL LLC and/or PREMIER CAPITAL, LLC are legitimate companies lawfully registered to do business in Delaware and Massachusetts, when neither is the case.

123. Defendants have entered courts throughout the country, claiming to represent PREMIER CAPITAL LLC and PREMIER CAPITAL, LLC, when the truth was that neither was registered in the states where they brought their causes of action. At all times during Plaintiff's dealings with Defendants, the two named companies were never registered in Delaware or Massachusetts, although they claimed to be.

124. Court dockets around the country have decided cases brought by PREMIER CAPITAL, LLC in Massachusetts (PREMIER CAPITAL, LLC v. Gavin),  319 B.R. 27 (Worcester, MA); BAP No. MB 04-028 (United States Bankruptcy Panel for the First Circuit); PREMIER CAPITAL, LLC v. KMZ, Inc., Supreme Judicial Court, Commonwealth of Massachusetts, a pending matter); Florida (PREMIER CAPITAL, LLC v. Davalle, No. 3D08-563, District Court of Appeal of Florida, Third District, in 2008; and New Hampshire (PREMIER CAPITAL, LLC v. Nickolas Skaltis, Suupreme Court of New Hampshire, Opinion issued 2007).

125. It was in 2006 in Massachusetts that the racketeers finally decided to attempt to become legitimate, by the subterfuge of keeping the same named company, but spelled out: PREMIER CAPITAL Limited Liability Company (Ex. 23). Such indiscriminate use of the different spellings for the same entity is a blatant example of their penchant for intentional legal obfuscation.

126. Taken to its logical conclusion, Defendants' rights to collect debts from any debtor, should be in question, if they were not even a legitimate company.  Plaintiff contends that their penchant for pursuing actions in state courts gave them a sense of security that no one would bother to connect the dots:  they were PREMIER CAPITAL fraudster racketeers, not a corporeal entity in a legal sense. From a racketeering sense, they were definitely an association-in-fact, acting under the disguise of being legitimate corporeal entities, and employees working for those entities.

## Defendants Have Used Litigation as a Racketeering Weapon

127.  Plaintiff asks the trier of fact the rhetorical question of to what extent a "legitimate" corporation would go to pursue a defaulter, if it involved incurring more costs than the original debt allegedly owed? For racketeers, the costs incurred are never enough, because they choose victims wisely, such as Plaintiff, a young, enterprising businessman "with a bright [financial] future."

128. Defendants have rolled the dice, and so far, they are winning their bet.  They have managed to extract $92,485 (Ex. 12), of an original Fleet Bank debt of $100,000, and are returning to the proverbial oil well, again, this time seeking to extract another $180,000 (Ex. 30).  Defendants see Plaintiff as a safe bet for providing perpetual income to their operation, and their lifelong mission will be to pursue him for more and more, as they have other defendants in other cases (See Affidavits of Keith Baker Ex. 21 and Michael Truman Ex. 25).

129. Plaintiff's affidavit recounts the extent to which Defendants have used the courts to try to make him bow to their extortions for more and more money—money that should never have been pursued in the manner it was—because it was a corporate, and not personal debt, for which Plaintiff has been relentlessly hounded personally.  Plaintiff attaches a number of pages

related to unofficial court docket records (Ex. 31), showing the procedural machinations Defendants have used, involving countless lawyers - but little evidence on Defendants' part. Plaintiff is appalled that the legal system supports this level of vitriol and power play against corporate actors, who are stripped of their legality because of a particular desire by racketeers to find money wherever they can.

130. Plaintiff wages this litigation, not only to avenge a perceived wrong, but also to speak up for the other victims whose lives have been left threadbare by unseemly tactics befitting of fictional television characters, rather than real human beings.

131. THOMAS H. CURRAN, and his ilk have proven to be shills for racketeers, to such an extent that he has moved from law firm to law firm, no doubt because of the type of litigation he practices, and the types of clients he represents. Plaintiff does not resort to *ad hominem* attacks to be vindicitive--he is expressing his legal position of these Defendants, these types of people who get involved in such sinister rackeeering operations. The courts have been unwitting allies, choosing to turn a blind eye to Plaintiffs legitimate cause, potentially siding with racketeering quasi-criminals, who use every caprice to make their case sound stronger, because they (Defendants) bark the loudest.

132. Plaintiff again, begs the question: why is he, a corporate President whose company followed all of the formalities expected of a corporation, being hounded by Defendants who for years, have never bothered to abide by the same corporate behavior? How can they go into court seeking legitimacy when they are determined by other deliberatory bodies to be fraudsters (FDIC v. RICHARD GLEICHER), engaging in conflicts of interest (THOMAS H. CURRAN) (Ex. 34), and affiants, operating under color of law as bankers, but without any lawful authority (SANTANDER's JOHN P. BOWEN, and CHRISTOPHER K. PFIRRMAN) to engage in racketeering acts?

133. Defendants seek to muzzle Plaintiff's ability to bark by filing Motions in Limine (Ex. 22) and Protective Orders (Ex. 33) that might "cause embarrassment" to Defendants, who have

shown an utter incapacity for feelings in their scorched earth litigation against Defendant.  They seek to deny any discussion of "the past," as if it were so long ago, when the fact is, that in this litigation the past is prologue. They would not be where they are today were it not for their illegal, oppressive and deceitful acts of the past.  Plaintiff begs the court to start at the very beginning to witness what Defendants acts the latter don't want the court to see; Defendants, consummate racketeers, tried to get money, however they could, including, but not limited to undertaking the following (in addition to vigorously objecting to Plaintiff's repeated argument that the 2002 case (Ex. 7) was borne of fraud and racketeering acts by Defendants):

134.  YEAR 2002

    A.  Attaching a corporate President's home.

    B.  Suing the companies clients.

    C.  Pursuing Default Judgment after Service of Process Returned.

    D.  Attaching home of President (who was never hiding).

    E.  Forcing a promissory note for a corporate President to personally pay a corporate debt.

135. YEAR 2010

    F.  Suing Corporate President for not paying full amount of note.

    G.  Seeking order of Default after Plaintiff loses counsel and makes procedural error representing himself after he can no longer afford counsel

136. YEAR 2012

    H.  Plaintiff files Chapter 13, then Chapter 7 Bankruptcy, contested by Defendants.

    I.  Defendants attend two 341 Hearings (Ex. 27 & Ex. 34).

    J.  Defendants pursue adversary proceedings, which time is spent attempting to show how Plaintiff and his corporation(s) were one and the same (Ex. 26).

## THE ENTERPRISE ENGAGED OR AFFECTED INTERSTATE COMMERCE

137. Defendants' victims come from all parts of the United States.

138. Specifically because Defendants allege to be empowered to collect debts based upon its receipt of assignments from banks doing business across the United States, Defendants' actions have a profound influence upon the banking industry.  If every debt collector were allowed to behave as Defendants have, anarchy would be the only result.  Any person could walk up to a debtor exclaiming, "Pay me. I bought the right to collect your debt," without any proof and go to court on the same false claim. PREMIER CAPITAL and its ilk believe that they are not required to adhere to contractual niceities.  Instead, they go across the country, creating corporations throughout the United States, operating as a lawless racketeering enterprise entitled to hound defaulting companies and their corporate officers to their ruinous end.

139. Defendants as so-called debt collectors patently refused to comport with their own alleged obligations, demanded of them in the Sovereign Loan Purchase and Sale Agreement, a document which surfaced only nine years after they first interacted with Plaintiff, alleging its terms (Ex. 29). Although Plaintiff disputes the authenticity of the document, even if it were a legitimate document, Defendants displayed a willfully blindness concerning their own obligations under its general banking terms:

> General Caveats. Assignor advises Assignee that certain of the Loans may be subject to settlement, forbearance or similar agreements. Pursuant to such agreements, Assignee may  be required to forbear from exercising any remedies under the Loan Documents or from levying and executing on any judgments or other judicial remedies. Assignor further advises Assignee that certain of the Loan Documents, judgments or other judicial remedies (as applicable) being assigned by Assignor to Assignee may have been modified by the bankruptcy or receivership proceedings of an Obligor.

140. Defendants felt empowered by their alleged mandate, but willfully ignored both the letter and the spirit of the Sovereign Bank Loan Purchase and Sale Agreement, which terms required Defendants to be bound, also. Written throughout the agreement are terms that suggest that the Assignee was supposed to adhere to the standards generally expected of a federal savings bank:

3.3. Assigned's Closing Responsibilities. On the closing date, the Assignee shall:

(a) deliver to the Assignor, evidence satisfactory to the Assignor as to matters of Assignee entity due organization and status as of the date hereof, as well as authority to have entered into this agreement.

...

141. Said clause listed above begs the question of why those "organization and status" documents were never presented to Plaintiff as proof of PREMIER CAPITAL LLC's bona fides. When they did provide the documents, it was 9 years after their dealings with Plaintiff and they were presented by a wholly different company not having any nexus to Plaintiff's 2002 case (unless, indeed, the corporate veil is pierced as Plaintiff herein requests).

142. Once Plaintiff became apprised of PREMIER CAPITAL LLC's claims of owning Fleet Bank's original debt (Ex. 8), Refresh Software Corporation hired an attorney to assist the corporation, hoping that would quell the pressure he was feeling personally. That outside assistance didn't have any effect on Defendants' modus operandi: they dug in their heels, again, claiming that they had a right to collect from Sovereign Bank's debtors. A tentative settlement had been reached on April 11, 2003, but when Refresh Software's attorney asked Defendants for records without redactions, Defendants filed a notice of default with the court (Ex. 9). Such a tactic evinces the intricacies of the racketeering organization, which included not only PREMIER CAPITAL, LLC., but its attorney(s), who, instead of being officers of the

court, wielded the bat of their clients to beat their adversaries into submission. The surprise

tactic of filing a notice of default had the intended effect of settling the litigation, which, though

filed against Refresh Software Corporation, originally, was settled against Plaintiff personally.

By putting the attachment on Plaintiff's home (Ex. 7), they sidestepped the bigger question of

whether they had any documents to show their entitlement to even one cent of Refresh

Software's corporate debt. In effect, they deceptively beat him down, creating a whole new

contract that effectively erased the original one upon which they rode into town avenging on

behalf of Sovereign Bank (Ex. 10).  Now, Plaintiff really was indebted to PREMIER CAPITAL,

LLC, a company about which Plaintiff knew nothing, but would be in hock (and in their

crosshairs) for decades to come, an established modus operandi witnessed by another of

Defendants' victims (See Affidavit of Michael Truman, Ex. 25).

143. Again, Defendants rode into town waving an agreement which terms it ignored:

Section 4 Assignor's Representations and Caveats

The Assignor makes the following representations for the benefit of the Assignee as of

the date of this Agreement, which representations shall terminate upon the assignment,

sale or other transfer of a Loan by the Assignee:

4.1 Authority; Binding on the Assignor; Enforceability:  The Assignor is duly

organized, validly existing and in good standing under the laws of its jurisdiction

of organization. The Assignor has powers adequate for the making and

performing of this Agreement and has taken all action required to make all other

provisions of this Agreement the valid and enforceable obligations the purport to

be. Each person executing this Agreement and any other instruments required to

be delivered hereunder on behalf of the Assignor has been duly authorized by

the Assignor to execute and deliver such instruments.

4.2 Ownership of Loan Documents.  Except as may be set forth in any loan participation agreement, loan syndication agreement, or similar arrangement that has been disclosed to the Assignee, the Assignor is the owner of an undivided legal and equitable interest in and to the Loan Documents and the Assignor has not previously assigned the Loan Documents, in whole or in part, to any other person or entity.

***

4.4 Loan Files.  To the best of Assignor's knowledge and belief, the Assignor has indluded in the loan files reviewed by the Assignee copies of all of the Loan Documens in it spossessiona has not purposely exlucded any documents or information of the purpose of misleading the Assignee.

4.5. General Caveats: Assignor advises Assignee that certain of the Loans may be subject to settlement, forbearance or similar agreements. Pursuant to such agreements, Assignee may be required to forebear from exercising any remedies under the Loan Documents or from levying and executing on any judgments or other judicial remedies.  Assignor further advises Assignee that certain of the Loan Documents, judgments or other judicial remedies (as applicable) being assigned by Assignor to Assignee may have been modified by the bankruptcy or receivership proceedings of an Obligor.

Section 5:  Assignee's Representations

5.1 Organizational Matters:  The Assignee is duly formed or organized, validly existing and in good standing under the laws of the jurisdiction of the assignee's formation or organization and is registered or qualified to conduct business in all other jurisdictions in which the failure to be so registered or qualified would

materially and adversely affect the ability of the Assignee to perform the
Assignee's obligations under this Agreement.

5.2 Authority and Enforceability.  The Assignee has the power and authority to
execute, deliver and perform this Agreement and all related documents to which
the Assignee is a party and has taken all necessary action to authorize such
execution, delivery and performance.

144. Despite the obligations specifically identified and agreed to by them in the Sovereign
Loan Purchase and Sale Agreement (Ex. 29), it would appear that Defendants didn't read its
terms.  The agreement obligated them to certain post-closing covenants, specifically pertaining
to collection practices:

10.1 Collection Practices.  The Assignee will not violate any laws relating to
unfair credit collection practices in connection with the Loan Documents.  The Assignee
hereby indemnifies the Assignor and agrees to hold the Assignor harmless from and
against any and all claims demands, losses, damages, penalties, fines, forfeitures,
judgments, legal fees and any other costs, fees and expenses incurred by the Assignor
as a result of any claim, demand or assertion that, after the Closing the Assignor was in
any way involved in or had in any way authorized any unlawful collection practices in
connection with the Loan Documents.

145. Most important is the obligation upon both parties to the Assignment to be bound
even after the closing:

12.10  Survival.  Each and every representation, warranty and covenant herein made by
the Assignor and the Assignee shall survive the closing, and shall not merge into any

document executed as part of the Closing, but instead shall be independently enforceable except to the extent expressly limited in Section 9.1

146. As [Plaintiff's misfortune in dealing with Defendants] would have it, section 9.1 is missing in the document, along with other sections that appear to have been selectively and fraudulently deleted. It does not take Holmesian detective work to conclude that the original Sovereign Bank Loan Purchase and Sale Agreement was likely tampered with: the section headings throughout the majority of the document are placed no where in particlar, suggesting that the document was free-flowing, i.e., continuous, one heading after the other. That is not evident on certain pages, however, as Section 3 does not follow contiguously with Section 2; instead it begins on a separate page at the top and there is a blank page staring back. Similarly, Section 9 Assignee's Remedies doesn't even list their terms, even though other parts of the Agreement refer to them, e.g., Section 9.1, which is missing.

147. Even more troubling is the appearance of the Sovereign Bank Loan Purchase and Sale Agreement, document which lists PREMIER CAPITAL, LLC, as Assignee, a company which, at the time of its alleged signing, did not officially exist--anywhere.

## CAUSES OF ACTION

148. At all relevant times, Defendants RICHARD GLEICHER, JOHN P. BOWEN, JOHN D. CUMMINGS, Jr, CHRISTOPHER K. PFIRRMAN, and THOMAS H. CURRAN, are all "persons" within the meaning of 18 USC § 1961(3), who have engaged in a pattern and practice of racketeering activity under 18 USC § 1961(5) since the effective date of October 15, 1970.

**COUNT 1    18 USC § 1962(a) Racketeer Influenced Corrupt Organizations Act**

149. Plaintiff repeats and re-alleges every allegation above as if fully set forth herein.

150. As Principals, under 18 USC § 2 definitions, RICHARD GLEICHER; JOHN D. CUMMINGS, Jr.; NICHOLAS J. MAIMONIS; officers of PREMIER CAPITAL; PREMIER CAPITAL LLC; PREMIER CAPITAL LLC a Delaware Limited Liability Company; PREMIER CAPITAL LLC a Massachusetts Limited Liability Company; PREMIER CAPITAL, LLC; PREMIER CAPITAL, LLC a Delaware Limited Liability Company; PREMIER CAPITAL, LLC a Massachusetts Limited Liability Company; PREMIER CAPITAL LIMITED LIABILITY COMPANY; PREMIER CAPITAL LIMITED LIABILITY COMPANY, a Delaware Limited Liability Company; PREMIER CAPITAL LIMITED LIABILITY COMPANY, a Massachusetts Limited Liability Company, and JOHN P. BOWEN,  and THOMAS H. CURRAN,  co-conpsirators, did jointly and severally acquire and maintain their interest(s), in and control over said herein-named "PREMIER CAPITAL" enterprises in Delaware and Massachusetts, in violation of 18 USC § 1962(a).

151. Pursuant to their racketeering efforts, under 18 USC §1962(a), RICHARD GLEICHER,  JOHN D. CUMMINGS, Jr.,  NICHOLAS J. MAIMONIS,  and THOMAS H. CURRAN,  engaged in various concerted schemes by using false premises to harass defaulting debtors through service of process, forcing them to restructure their debt obligations, causing their homes to be attached, and their lives a nightmare by their relentless pursuit of more ways to derive more income therefrom.  Those machinations involved claiming to own assignments of rights to receive /outstanding loan payments without any paper trail to evince the same, and pressuring debtors to restructure their debts into new loans, thereby creating a new contract with Premier, erasing the nonexistent contracts.

152. As Vice Presidents of the PREMIER CAPITAL – herein named entities, RICHARD GLEICHER,  JOHN D. CUMMINGS, Jr.,  NICHOLAS J. MAIMONIS,  worked with JOHN P. BOWEN, these defendants ran a smooth, seamless operation of backing each other's lies in court testimony, tag-teaming each other, in tricking state court judges into believing that they were legitimate businessmen with a legitimate aim of collecting legitimate debts throughout the

country. These defendants were actually co-conspirators, who, instead of presenting a paper -
trail, crafted their own stories, usually presented with little evidence, persuading victim after
victim around the country to believe that Premier owned the rights to secure their debts.

**COUNT 2        18 USC § 1962(c), Racketeer Influenced Corrupt Organizations Act**

153. To bring about their scheme(s), Defendants conducted affairs of a racketeering
enterprise under 18 USC § 1962 (c), by aiding, assisting, and/or directing the procurement of
debts by defaulted borrowers, and without any proof of entitlement to those debts, seizing and
attaching assets of the debtors to coerce compliance, only to create new debt obligations to
supplant the original debt obligations of which they had no legitimate proof. To further
substantiate their bona fides, they would force their victims to go through further expense of
defending law suits, which invariably caused them more suffering, coercing them to yield to
PREMIER CAPITAL LLC's "persuasion."

154. As a result of the continued pattern of racketeering conducted by this enterprise,
Plaintiff has been and continues to be injured in his business and property in violation of 18
USC § 1962(c).

155. Defendants' wrongful conduct in violation 18 USC §1962(c) was the direct and
proximate cause of Plaintiff's injuries.

156. Defendants' violation of 18 USC § 1962(c) entitles permits Plaintiff to recover three
times the damages sustained by Defendants' conduct, together with costs and attorneys fees.

**COUNT 3 18 USC §1962(d) - Conspiracy to Engage in a Pattern of Racketeering
Activity**

157. Plaintiff repeats and re-alleges every allegation above as if fully set forth herein.

158. Defendants have willfully combined, conspired and agreed to violate 18 USC

§§ 1962(a) (c), and (d) -- that is, to conduct and/or participate, directly or indirectly, in the conduct of the affairs of an enterprise through a pattern of racketeering activity.

159. This particular triumvirate of racketeers (RICHARD GLEICHER, THOMAS H. CURRAN,  JOHN D. CUMMINGS, Jr., JOHN P. BOWEN, and NICHOLAS J. MAIMONIS, worked concertedly, with an ability to fool everybody that they were each legitimate corporate actors, when in reality they were a sweat shop of hustlers who schemed, concocted, then corroborated each other's stories.  By teaming up with each other, they would give the appearance in court testimony that their fabrications were true:  they could extort hundreds of thousands of dollars from their unwitting victims by telling the same story, then, negotiating themselves out of their falsities by creating new, legitimate debt obligations from their unwitting victims.

### COUNT 4 MAIL FRAUD 18 USC §1341

160. Plaintiff repeats and re-alleges every allegation above as if fully set forth herein.

161. The Defendants committed mail fraud in violation of 18 USC §1341. Specifically, Defendants engaged in an intentional scheme to defraud and obtain money from Plaintiff through false or fraudulent pretenses, representations, and promises. It was reasonably foreseeable to each Defendant that the mails would be used in furtherance of the scheme, and the mails were in fact used to further and execute the scheme to defraud.

162. For the purpose of furthering and executing the scheme to defraud, the Defendants regularly caused matters and things to be placed in a post office or authorized depository, or deposited or caused to be deposited matters or things to be sent or delivered by the United States Postal Service, through it's own alleged records and admissions of alleged "official" documents.

163. The Defendants used the mails on a daily basis for the above stated purposes to further and execute the scheme to defraud Plaintiff, also with the intent of furthering the false

impression that their demands were legitimate. At the time the mailings were made, Plaintiff to whom they were mailed, did not know that these representations contained therein were false and fraudulent, and the representations were material to Plaintiff's decision to sign a personal promissory note. Had Plaintiff known that these representations were not true, he would not have signed the personal promissory note.

## COUNT 5 WIRE FRAUD, 18 USC § 1343

164. Plaintiff incorporates by reference each and every allegation contained in this Complaint.

165. Defendants committed wire fraud in violation of 18 USC §1343. Specifically, the Defendants engaged in an intentional scheme to defraud Plaintiff and to obtain money from Plaintiff through false or fraudulent pretenses, representations, and promises. It was reasonably foreseeable to each Defendant that the wires would be used in furtherance of the scheme, and the wires were in fact used to further and execute the scheme to defraud.

166. For the purpose of furthering and executing the scheme to extort and defraud, Defendants regularly transmitted or caused to be transmitted by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds (the "wirings"); said wires were used by them on a daily basis for the above stated purposes of furthering

167. and executing the scheme to defraud Plaintiff. At all stages of Defendants' prosecution of their action against Plaintiff, Defendants furthered the false impression that their demands were legitimate. At the time the wirings were made, Plaintiff, to whom they were wired did not know that the representations contained therein were false and fraudulent. The false representations were material to Plaintiff' decision to sign the promissory note.

168. Each act of wire fraud detailed in this Complaint each constitutes a predicate act of

fraud under RICO because each wiring furthered and executed the scheme to defraud Plaintiff. Defendants each participated in the scheme to defraud knowingly, willfully, and with a specific intent to defraud Plaintiff into signing the personal note on his corporation's behalf.

## COUNT 6 FAIR DEBT COLLECTION PRACTICES ACT (FDCPA) 15 USC §1692, ET SEQ

169. Plaintiff repeats and re-alleges every allegation above as if fully set forth herein.

170. As individual and collective debt collectors, Defendants did violate the FDCPA by using deceptive and unfair debt collection practices, while Plaintiff was in default, such as 1) not providing notice of the debt, 2) attaching his home, 3) forcing him to negotiate a new loan, for which he paid almost the full amount, then 4) causing Plaintiff to pay even more than he was allegedly obligated, erasing the original payments made in good faith.

## COUNT 7 18 USC §1957  ENGAGING IN MONETARY TRANSACTIONS IN PROPERTY DERIVED FROM SPECIFIED UNLAWFUL ACTIVITY

171. Plaintiff repeats and re-alleges every allegation above as if fully set forth herein.

172. Defendants, self-described debt collectors, purposefully inveigled Plaintiff, a hardworking corporate Director and Officer, who incurred debt in the course of managaing a software business, into believing that he was not entitled to either option of bankruptcy protection or insurance coverage. Instead, defendants used coercive tactics to force Plaintiff to become indebted personally, accomplished by using the caprice of attaching his personal home to force him into submission. Plaintiff, who was already vulnerable as a result of his unfortunate circumstances, signed a personal note, thereby avoiding the real issue of whether or not they ever had any title to the assignments they claimed, which gave them the right to collect the debts owed Plaintiffs original debts.  Defenants' operation is flagrantly deceptive and in violation of the FDCPA.

## COUNT 8 EXTORTION

173. Defendants extorted and/or attempted to extort money from Plaintiff. Through verbal and written communications, Defendants maliciously and improperly coerced Plaintiff into entering into a settlement agreement to become personally responsible for the debts of a wholly legitimate corporation, under the unnecessary and malicious act of seizing his home without first introducing themselves as collectors of the debt. Defendants made the threats with the intent that Plaintiff would rely on them.

174. Plaintiff did rely on Defendants' threats, which was material to Plaintiff's decision to settle. Had Plaintiff known that Defendants' claims were unsubstantiated, Plaintiff would not have created a whole new promissory note, personally, encumbering himself with a corporate debt. As a direct and proximate result of the Defendants' threats, and Plaintiff's reliance on those threats, Plaintiff suffered injuries, damages. Plaintiff is entitled to punitive damages because the Defendants' conduct was malicious, willful, wanton, intentional, and outrageous, evidencing evil motive, reckless indifference to or reckless disregard for the rights of others.

## COUNT 9 CONSPIRACY TO COMMIT EXTORTION

175. Plaintiff incorporates by reference all allegations contained in this Complaint.

176. The Defendants each knowingly and willfully conspired and agreed to engage in the scheme to extort in the manner described in this Complaint inasmuch as the Defendants had to coordinate their efforts to purport to be a legitimate debt collector, with no records, to evince their claims of legitimacy. Each time the defendants used JOHN P. BOWEN, to sign an

affidavit or letter claiming to have personal knowledge of any and all banking histories of Plaintff, without any paper evidence to corroborate it, the men were engaged in a scheme to extort money from Plaintiff.  Furthmore, affidavits of the other co-conspirators, RICHARD GLEICHER,  JOHN D. CUMMINGS, Jr., and NICHOLAS J. MAIMONIS,  were in furtherance of their extortion objectives.

### COUNT 10 FRAUDULENT OMISSIONS/NONDISCLOSURE

177. Plaintiff incorporates by reference all allegations contained in this Complaint.

178. Defendants failed to disclose to and concealed from Plaintiff, and engaged in a scheme to keep Plaintiff ignorant of, pertinent and material information regarding the falsity of certain claims made by Defendants. Specifically, Defendants failed to disclose and concealed from Plaintiff pertinent and material information that includes but is not limited to the following:

  a.  Any form of duly sworn, signed and notarized Purchase & Sale between Sovereign Bank and PREMIER CAPITAL, LLC

  b.  Originally signed and transferred Fleet Bank stamped loan documents

  c.  Any form of duly sworn, signed and notarized Loan Assignment Instrument

  d.  Any form of accounting

  e.  Presenting self-serving, factually bogus, signed Affidavits from whoever was available attesting to information and documents not in their custody or possession

  f.  Acting as though PREMIER CAPITAL, LLC was licensed by the Massachusetts Division of Banks for either loan servicing or debt collection

  g.  That Sovereign Bank, a federal savings bank was doing legitimate business with licensed businesses authorized to do business with the bank

      h.  The relevance of the Gavin litigation, which was applicable to Plaintiff's

          company's circumstances on or about the same time as Defendants were

          extorting compliance from them (Ex. 35).

179. Defendants had superior knowledge and information about that pertinent and material information, which knowledge and information was not reasonably available to Plaintiff and could not have been discovered through ordinary diligence. The Defendants therefore had a duty to speak and inform Plaintiff the truth about the nondisclosed, omitted, and concealed facts.

180. By failing to disclose to, omitting, and concealing from Plaintiff the true facts regarding the Sovereign Bank assignment, the Defendants intended and did create a false impression of the actual facts in the mind of Plaintiff.

181. Defendants sought to ensure that Plaintiff would not discover the truth by adding pressure by pursuing lawsuits against Plaintiff, in the middle of ongoing negotiation

182. The Defendants' nondisclosures, omissions, and concealments were material because, had Plaintiff known the truth, he would not have agreed to Defendants' terms for settlement and would not have entrusted $92,485[1] in funds paid by Refresh Software Corporation to the Defendants.

183. The Defendants knew that: (1) this information would have been highly material to the Plaintiff's decision of whether to settle; (2) Plaintiff was ignorant of this material information; and (3) Plaintiff was not in a position to discover the truth about Defendants' racketeering operations.

184. The Plaintiff relied on the Defendants' fraudulent nondisclosures, omissions, and

---

[1] The poor, non-specific accounting of PREMIER CAPITAL, LLC is indicative of their racketeering. Rather than hire accountants and records to justify their demands for payment, they stuck with whatever amount they desired. Plaintiff asks only to pay what was required of him, and no records, accounting, amortization schedules, etc, were provided until 10 years after Plaintiff originally asked for them.

185. concealments when Plaintiff made settlement payments and other expenditures that they would have avoided had they been aware of the truth. Furthermore, Plaintiff's reliance was reasonable and justified under the circumstances, and he had a right to rely on the facts as he believed them to be absent knowledge of the fraudulent nondisclosures, omissions, and concealments.

186. As a direct and proximate result of the Defendants' fraudulent nondisclosures, omissions, and concealments, and Plaintiff' reliance on the assumption that the concealed and undisclosed facts did not exist or were different from what the facts actually were, Plaintiff suffered injuries, damages, or losses in an amount to be determined at trial.


### COUNT 11 FRAUDULENT MISREPRESENTATIONS


187. Plaintiff incorporates by reference all allegations contained in this Complaint.

188. The Defendants made numerous false representations, both orally and in writing, to Plaintiff, including, but not limited to the following:

   a. Claiming that it was authorized to collect debts or service loans in the Commonwealth of Massachusetts.

   b. Claiming that PREMIER CAPITAL, LLC had standing as a duly authorized or organized entity by the Commonwealth of Massachusetts or by any other state.

   c. Providing false documentation, heavily redacted to a degree that it did not effectively represent what Defendants claimed it represented.

   d. Providing forged documents purporting to show signatures of JOHN P. BOWEN and CHRISTOPHER K. PFIRRMAN,  which did not match "official" signatures on record.

   e. Providing handwritten bank documents with no authorized notary seals

    f.   Trudging out the same witnesses, namely, RICHARD GLEICER, JOHN D.

        CUMMINGS, Jr., Thomas DiFrancesco, NICHOLAS J. MAIMONIS, JOHN P.

        BOWEN, and CHRISTOPHER K. PFIRRMAN, to corroborate orally or via

        affidavit the veracity of claims not shown by their evidence (or lack thereof).

    g.   Claiming, without documentary corroboration that Plaintiff owed late payment

        fees, without a schedule to show proper accounting.

    h.   Filing "reach and apply" lawsuits against Refresh Software Corporation's clients,

        claiming that they owed payments to PREMIER CAPITAL, LLC, to oppress and

        embarrass Plaintiff.

189. At the time Defendants made these misrepresentations, Plaintiff did not know that

they were false and fraudulent, and those false representations were material to Plaintiff's

feeling coerced into signing a 2003 promissory note. Had Plaintiff known that these

representations were not true, he would not have agreed to Defendants' terms for settlement.

Defendants made the false representations knowing them to be false or being aware that

Plaintiff did not know whether the representations were true or false.

190. Defendants willfully and consciously disregarded the truth of these false

representations, made with the intent that Plaintiff would rely on the false representations, and

kept him ignorant of the material. Furthermore, Plaintiff's reliance was reasonable and justified,

and he had a right to rely on the false representations.

191. As a direct and proximate result of the Defendants' false representations, Plaintiff

suffered injuries, damages, or losses.

### COUNT 12 CONSPIRACY TO COMMIT MAIL FRAUD

192. Plaintiff incorporates by reference all allegations contained in this Complaint.

193. Defendants each knowingly and willfully conspired and agreed to engage in the

194. schemes to defraud as described in this Complaint, and committed and caused to be committed one or more overt and unlawful acts in furtherance of the conspiracy, including but not limited to the acts described in this Complaint.  As a direct and proximate result of the Defendants' conspiracy to commit mail fraud, Plaintiff suffered injuries, damages, or losses.

### COUNT 13 CONSPIRACY TO COMMIT WIRE FRAUD

195. Plaintiff incorporates by reference all allegations contained in this Complaint.

196. Defendants each knowingly and willfully conspired and agreed to engage in the schemes to defraud as described in this Complaint, and committed and caused to be committed one or more overt and unlawful acts in furtherance of the conspiracy, including but not limited to the acts described in this Complaint.  As a direct and proximate result of the Defendants' conspiracy to commit mail fraud, Plaintiff suffered injuries, damages or losses.

### COUNT 14 CONSPIRACY TO COMMIT FRAUD

197. Plaintiff incorporates by reference all allegations contained in this Complaint.

198. Defendants each knowingly and willfully conspired and agreed to engage in the schemes to defraud as described in this Complaint, and committed and caused to be committed one or more overt and unlawful acts in furtherance of the conspiracy, including but not limited to the acts described in this Complaint.  As a direct and proximate result of the Defendants' conspiracy to commit mail fraud, Plaintiff suffered injuries, damages or losses.

### COUNT 15 AIDING AND ABETTING FRAUD

199. Plaintiff incorporates by reference all allegations contained in this Complaint.

200. Defendants each knowingly and willfully conspired and agreed to engage in the

schemes to defraud as described in this Complaint, and committed and caused to be

committed one or more overt and unlawful acts in furtherance of the conspiracy, including but

not limited to the acts described in this Complaint.  As a direct and proximate result of the

Defendants' conspiracy to aid and abet the commission of the frauds described herein, Plaintiff

suffered injuries, damages or losses.

### COUNT 16 DECEPTIVE TRADE PRACTICES

201. Plaintiff incorporates by reference all allegations contained in this Complaint.

Defendants' practices have had a profound impact upon both national and international

commerce, and may prohibit other American companies from trusting and doing business with

start-ups like that of the parties before Defendants "went rogue." This case necessarily impacts

upon commerce. Defendants have proven to be immoral, unethical, oppressive, unscrupulous,

and substantially injurious to virtually any investor with whom they come or have come into

contact.

### COUNT 17 UNJUST ENRICHMENT

202. Plaintiff incorporates by reference all allegations contained in this Complaint.

203. The Defendants were enriched and benefited by appropriating payments they were

not entitled to receive as they were a direct result of their skulduggery.  Defendants have

received benefits in various ways, including through direct payments.  Defendants recognized,

accepted, and retained all these benefits at Plaintiff's expense, knowing that they were

cheating him out of monies that he was not obligated to pay.  Because of the Defendants'

actions, Plaintiff incurred unnecessary and unwarranted financial damages.  Given the circumstances described in this Complaint—including the fact that each Defendant directed, encouraged, knew of, and/or facilitated fraudulent and illegal conduct—it would be inequitable and unjust for the Defendants to retain the benefits they received at Plaintiff's expense.

204. Plaintiff is entitled to all lawful and equitable remedies attendant to Defendants' unjust enrichment, including restitution of all fees, monies, and assets unjustly retained, or converted for the Defendants' use, to the detriment of the Plaintiff, and disgorgement of profits or gains on such fees, monies, and/or assets.

205. Plaintiff incorporates by reference each and every allegation contained in this Complaint.

206. Defendants received settlement payments from Plaintiff. As described in this Complaint, the money received by Defendants was intentionally, fraudulently, and illegally appropriated for the Defendants' use.  The Defendants thereby received or obtained possession of money which in equity and good conscience belongs to Plaintiff. Plaintiff is entitled to all lawful and equitable remedies attendant to the Defendants' misconduct, including restitution of all such fees, monies, or assets purchased with the monies unlawfully had and received, and disgorgement of profits generated by the fees, monies or assets.

## COUNT 18 CONVERSION

207. Plaintiff repeats and re-alleges every allegation above as if fully set forth herein.

208. Defendants, who during the whole existence of their pursuit of Plaintiff's money, never owned a lawful right to collect upon it. Instead, they used a very fine-tuned and deft legal sleight of hand to prevent Plaintiff from the privilege of benefitting from the benefits of a separate existence from that of his corporation, while Defendants were [flauntingly] not

incorporated or registered in any state in which they have pursued debt collection--for decades.

209. Defendants' taking of monies from their victims, is tantamount to a hold up, by forcing promissory note by attaching someone's home. Defendants should not be entitled to the monies alleged owed them anymore than a criminal should be able to sue on replevin to have immediately stolen property returned.

210. Defendants have never cared about the amounts own, and appear to have a sliding scale - because the debt will always go higher and higher, which is the whole purpose of their racketeering scheme. They hound people to their penury, while they continue to pretend to be legitimate businessmen.

## COUNT 19 CONSTRUCTIVE TRUST

211. Plaintiff incorporates by reference all allegations contained in this Complaint

212. The Defendants, through their fraudulent conduct, induced Plaintiff into paying money and entering into settlement agreements under methods using extortion, deception, fraud, harassment, and connivery. Defendants wrongfully diverted monies from Plaintiff in violation of statutory and common law and used the proceeds for their legitimate businesses and to further their scheme.

213. Defendants have retained property which rightfully belongs to Plaintiff. Plaintiff request the Court impose a constructive trust on the Defendants' property, including accounts and real and personal property of each individual Defendant, and accounts and property owned by each entity, and order an equitable accounting of such property.

## COUNT 20 UNFAIR TRADE PRACTICES – G.L. CHAPTER 93A, SECTIONS 2 AND 9

214. Plaintiff repeats and re-alleges every allegation above as if fully set forth herein.

215. Defendants have knowingly, willfully, intentionally and/or recklessly committed unfair trade practices in violation of the above captioned, as well as violating rules, regulations and statutes in such a way as to invoke G.L. Chapter 93A.

## COUNT 21 PIERCING THE CORPORATE VEIL

216. Plaintiff repeats and re-alleges every allegation above as if fully set forth herein.

217. RICHARD GLEICHER; THOMAS H. CURRAN; JOHN D. CUMMINGS, Jr.; JOHN P. BOWEN; CHRISTOPHER K. PFIRRMAN; and NICHOLAS J. MAIMONIS, who are natural persons, used their association-in-fact enterprise as swords with which to commit illegal and inequitable acts and engaged intentionally tortious conduct in violation of the declared public policy of the United States.

218. The individual Defendants used PREMIER CAPITAL; PREMIER CAPITAL LLC; PREMIER CAPITAL LLC a Delaware Limited Liability Company; PREMIER CAPITAL LLC a Massachusetts Limited Liability Company; PREMIER CAPITAL, LLC; PREMIER CAPITAL, LLC a Delaware Limited Liability Company; PREMIER CAPITAL, LLC a Massachusetts Limited Liability Company; PREMIER CAPITAL LIMITED LIABILITY COMPANY; PREMIER CAPITAL LIMITED LIABILITY COMPANY, a Delaware Limited Liability Company; PREMIER CAPITAL LIMITED LIABILITY COMPANY, a Massachusetts Limited Liability Company; SANTANDER BANK (formerly Sovereign Bank), et al., to carry out their illegal scheme. Defendants also failed to observe corporate formalities and excessively fragmented their enterprises not for any legitimate business need but for the purpose of evading responsibility for their wrongful acts. Their use of the corporate fiction is evidenced in how many different corporate entities were used in waging their racketeering acts against Plaintiff.

219. Their attorney THOMAS H. CURRAN has proven to be inextricably involved in the racketeering enterprise, evidenced by his long-standing relationship with the parties, and his willful blindness to their machinations, calculated to deceive and confuse people about which entity was legitimately associated with the case.  Surely, a company involved in piercing the corporate veil of its corporate clients, victims to secure an individual officer's income as a debtor, would be inclined to be organized scrupulously.  These defendants did not care to observe formalities usually required of million dollar enterprises:  using template stationery with the proper corporate name; keeping copious and unassailable record-keeping of their clients' financial records, with daily updates, offered on demand.  Instead, these defendants "guessed," or merely declared sums without any rhyme or reason.

## COUNT 22 INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

220. Plaintiff, at trial, will be prepared to show the extent to which Defendants extreme and outrageous conduct has caused Plaintiff severe emotional distress and will be seek the appropriate damages, to the maximum allowed by law.

## COUNT 23 WILLFUL NEGLIGENCE

221. Plaintiff will be prepared to show, at trial, that SANTANDER BANK officials were aware of the activities of certain of its employees, namely, JOHN D. BOWEN, and CHRISTOPHER K. PFIRRMAN, who had unfettered discretion to run certain aspects of the bank's operations however they deemed fit, especially pertaining to representing Sovereign Ban's interests in selling its debts to questionable allegedly legal debt collecting entities [sic] such as Premier Capital, LLC.  The BANK appears to have been willfully negligent in having legitimate documentation to accurately reflected the Bank's official records; and it would also

have affirmed the illegal operations of the company, which would have been apparent had it asked for proof of PREMIER CAPITAL, LLC's right to do business with the bank. Instead, they turned a blind eye to PREMIER CAPITAL's boiler-room schemes, which intimiately included two of its own employees.

222. Massachusetts courts have already shown an intolerance toward PREMIER CAPITAL, LLC (or whatever name it used at the time), which has already proven to be a fraudulent enterprise. SANTANDER BANK, which is supposed to operate at the highest of standards to encourage the trust of its depositors, managed to willfully neglect its obligations to its customers, whose debts would fall under PREMIER CAPITAL's mismanagement.

223. Plaintiff expects SANTANDER BANK to be found liable to the fullest extent of the law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment against Defendants, pursuant to any and all civil remedies permissible under 18 USC § 1964(c), because he has been irreparably injured in both his business and his property, which injuries flow directly from defendants' predicate acts, acts which are proven to be malicious, fraudulent, and oppressive. Defendants' conduct justifies a level of sanctionable liability that will ensure that Defendants will not engage in such conduct in the future. Plaintiff seeks the following remedies:

**For Counts 1 through 9**

1) General damages of an amount to be proven at trial, including but not limited to compensatory and consequential damages;

2) Treble damages pursuant to established RICO civil penalties, under 18 USC §§ 1961, et seq.

3) Equitable accounting, including accounting to Plaintiff for any and all gains, profits, and advantages derived by Defendants from the racketeering scheme, and any and all Plaintiff's litigation expenses, including reasonable attorney fees and the costs of this action;

4) An attachment against the Defendants' property, attorney fees, and costs as provided by M.G.L. c. 223 § 42 and respective state statutes;

5) Injunctive relief, and as to SANTANDER BANK, any damages to which Plaintiff is entitled under theories of respondeat superior for the intentional acts of its employees, of which SANTANDER BANK did or should have had knowledge.

6) Injunctive relief preventing the sale or disposition of Defendants' assets acquired preventing the sale or disposition of Defendants' assets acquired through the scheme;

7) Injunctive relief to stop the scheme, and to prevent Defendants from destroying any evidence even remotely related to this action;

8) Dismissal of all pending court actions brought by Defendants against Plaintiff.


**For Counts 10 through 22**


1) General damages of an amount to be proven at trial, including but not limited to compensatory, consequential damages, and punitive damages to the extent allowed by law;

2) Equitable accounting, including accounting to Plaintiff for any and all gains, profits, and advantages derived by Defendants from their liable acts, and any and all Plaintiff's litigation expenses, including reasonable attorney fees and the costs of this action;

3) An attachment against the Defendants' property, attorney fees, and costs as provided by M.G.L. c. 223 § 42 and respective state statutes;

4) Injunctive relief to stop the scheme, and to prevent Defendants from destroying any evidence even remotely related to this action;

**For Counts 1 through 22**

1) A finding of alter ego status for all the named entities complained herein, ensuring that none can assert subsidiary status of Premier Capital, Inc., as they have been identified as part of the racketeering enterprise, and/or have been determined to be liable for committing the Counts alleged herein.

2) Plaintiff also seeks reasonable attorney's fees, expenses, and court costs, and such other and further relief as this Court thinks just and lawful.

**For Count 23**

1) Damages of an amount to be proven at trial, including but not limited to compensatory, consequential, and punitive damages.

JURY DEMAND

Plaintiff demands a trial by jury in this case.

Respectfully submitted:

/s/

J Graham Zahouiko

Pro se Plaintiff
J GRAHAM ZAHORUIKO
214 Magill Dr.
Grafton, MA  01519

Phone: 774-234-6870
Email: jgrahamzah@gmail.com

Plaintiff in Pro Per

This fifth day of June 2014

Complaint: J GRAHAM ZAHORUIKO v. PREMIER CAPITAL, et al        75