## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| J GRAHAM ZAHORUIKO | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION** |
| | ) | **NO. 4:14-40077-TSH** |
| | ) | |
| RICHARD GLEICHER, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**March 9, 2016**

**REPORT AND RECOMMENDATION**

Hennessy, M.J.

Currently pending before the court are three motions to dismiss[1] plaintiff J Graham Zahoruiko's ("Zahoruiko" or "plaintiff") complaint, which contains twenty-three counts originally arising from the defendants' alleged actions in connection with a bank loan obtained by plaintiff in or around 1999. The Honorable Timothy S. Hillman has referred the defendants' motions (Docket # 39, 41, 46) to me for a report and recommendation. See Docket # 61. As discussed below, plaintiff lacks standing to bring this action, and accordingly I recommend that his complaint be dismissed in its entirety.

Factual History

Except where otherwise indicated, the following facts are culled from plaintiff's seventy-five-page complaint ("Complaint"), his accompanying affidavit, and the voluminous exhibits thereto. In 1995 plaintiff created a web development company called SpaceNet Corporation, later

---

[1] One motion alternatively seeks a more definitive statement. See Docket # 39.

renamed SpaceWeb Corporation and subsequently Refresh Software Corporation ("Refresh"). Complaint at ¶ 42.  Starting in May 1998, the company (then named SpaceWeb Corporation) obtained from Fleet Bank ("Fleet") several business lines of credit; the last one, secured on May 26, 1999, provided plaintiff with $100,000 and replaced the previous lines of credit.  Id. at ¶¶ 43, 46-47; Docket # 2-1 at Ex. 6.  The loan carried a floating interest rate based on Fleet's prime rate (then 11.75%) plus an initial margin of 4 per cent, and required plaintiff's agreement that the bank could sell all or part of the loan.  Id. at ¶¶ 44-45; Docket # 2-1 at p. 114-18.  It also included plaintiff's personal guaranty of payment.  Docket # 2-1 at p. 125.[2]

At some point in 2000, Fleet sold a number of its assets to Sovereign Bank ("Sovereign"), which resulted in plaintiff receiving statements from, and making payments to, Sovereign[3] concerning the Fleet loan.  See Docket # 2-1 at Ex. 1 ("Zahoruiko Aff.") ¶ 30; Docket # 2-2 at Ex. 20.  On or around June 18, 2002 Sovereign sold the loan to Premier Capital, LLC ("Premier").  Docket # 2-3 at Ex. 29; see also Docket # 2-1 at Ex. 4 ¶ 4; Ex. 7 ¶ 11.[4]  As such, when plaintiff began struggling to make timely payments, he received a letter from Premier that he and his company (now named Refresh Software) owed $99,949.81.  Id. at ¶ 49; see also Docket # 47-1 at p. 13.  On August 8, 2002, Premier informed plaintiff that the note was in default, with an outstanding balance of $103,023.08, and demanded payment for same.  See Docket # 2-1 at Ex. 8.  Approximately two months later, Premier sought, and was granted, a writ of attachment on plaintiff's home.  See Docket 2-1 at Exs. 4, 7.

[2] This page is somewhat difficult to read but does appear to include a "Personal Guaranty" portion at the bottom.

[3] Sovereign was purchased by Santander Bank in or around October 2008.  See http://dealbook.nytimes.com/2008/10/13/spains-santander-buys-sovereign-for-19-billion/.

[4] Plaintiff questions whether this purchase ever took place.  E.g., Complaint at ¶ 58.

Although plaintiff concedes that Refresh was in default, he takes issue with the fact that it was Premier—an entity with which he had no prior dealings—that secured the attachment on his home.  See Complaint at ¶ 50.  And while he appears to concede that Premier sent a letter via Certified Mail concerning Premier's purchase of his debt,[5] plaintiff states that he does not recall receiving this correspondence.  Id. at ¶ 51.  Further, because the letter "was not on a unique stationery [sic] . . . to suggest that it came from a legitimate source," and that he was not contacted by telephone about the debt, plaintiff avers that "the contents of the alleged mail did not look sophisticated enough to be taken seriously."  Id.  Plaintiff similarly challenges Premier's "erroneously attaching Plaintiff's personal home to secure a corporate debt," stating that Premier's "uncorroborated claim that the debt was assigned to it" allowed for its "unfettered right to attach [plaintiff's] home."  See id. at ¶¶ 52 54.

Believing that the Fleet loan "was made for [Refresh's] use – not that of Plaintiff personally," plaintiff hired an attorney and reached a tentative settlement with Premier in April 2003.  Id. at ¶ 59.  However, when plaintiff's attorney asked defendants for certain unredacted records, defendants responded by filing a notice of default, a tactic which, according to plaintiff, "evinces the intricacies of the racketeering organization."  Id.  The Superior Court entered a default judgment on June 16, 2003, which plaintiff shortly thereafter sought to vacate.  See Docket # 2-1 at Ex. 9.  Premier then agreed to settle the litigation upon plaintiff's guaranty of Refresh's debt in the form of a personal promissory note (the "Note") in the amount of $128,000.  Complaint at ¶ 60.[6]  By execution of the Note (which included a personal guaranty by plaintiff) on July 1, 2003,

---

[5] The Complaint references a letter attached as Exhibit 7, see ¶¶ 50-51; however no such correspondence appears there.

[6] Notwithstanding the interest terms discussed above, plaintiff takes issue with this figure, noting that the original loan was for $100,000 and that less than a year prior, Premier had claimed it was due only $103,023.  See Complaint at ¶ 60.

the litigation was settled.  Id. at ¶ 61; Docket # 2-1 at Ex. 10.  The accompanying Settlement Agreement expressly provided that by execution of the Note, plaintiff and Refresh released Premier and all its past assigns from any and all claims arising out of or relating to the claims of plaintiff's default.  Docket # 2-1 at Ex. 10.

Over the next several years, Refresh paid approximately $20,000 due on the Note. Complaint at ¶ 62.  In early 2005 however, "things had taken a turn for the worse" and on March 5, 2007, Premier informed plaintiff that he and Refresh were in default.  Id.; Docket # 2-1 at Ex. 13.[7]  Plaintiff replied that the company was in financial distress but that it would try to continue making timely payments.  Complaint at ¶ 64; Docket # 2-1 at Ex. 14.  A similar letter from Premier followed in November 2007.  Docket # 2-1 at Ex. 15.

In March 2008, Refresh's new Chairman and President Robert Angelo and Premier Vice President/Account Manager John D. Cummings, Jr. ("Cummings") discussed a possible forbearance.  Complaint at ¶ 66.  By letter dated March 24, 2008, Cummings proposed a forbearance agreement to accommodate Refresh's request for same.  Docket # 2-1 at Ex. 16.  The resulting agreement provided in relevant part that: (1) as of May 15, 2008 the total outstanding balance owed was $111,879.01; (2) the time for plaintiff's final payment was extended to April 30, 2012; (3) Refresh was to pay a one-time forbearance fee as well as forty-eight monthly payments of $2,400 (terms that plaintiff now refers to as "quite onerous").  See Docket # 2-1 at Ex. 17; Complaint at ¶ 70.  On May 30, 2008, the forbearance agreement was executed—by Cummings, as well as by plaintiff both as Refresh's President and as a personal guarantor.  See

[7] Plaintiff points out that Premier's March 5, 2007 letter (1) referenced the sale of a loan from Bank of America (not Fleet) to Premier; and (2) contained a slightly different letterhead and salutation from Premier's prior correspondence.  See Complaint at ¶¶ 62-64; Docket # 2-1 at Ex. 13.

Docket # 2-1 at Ex. 17.  Notwithstanding, plaintiff stresses that the companies' correspondence gave "every inference that the note belonged to the corporation," and that the forbearance agreement references only Refresh.  See Complaint at ¶ 66-67.  Similarly, although the agreement, signed twice by plaintiff, stated that Refresh had requested Premier's forbearance and that Refresh "had an opportunity to review th[e] agreement and its terms with independent legal counsel of [his] choice," plaintiff's Complaint contends that defendants "badger[ed] and harass[ed] Plaintiff into signing a personal guarantee."  See Docket # 2-1 at Ex. 17; Complaint at ¶ 67.  He also characterizes the parties' negotiations as Premier refusing to provide a requested accounting and instead "demand[ing] that Refresh . . . and Plaintiff execute the forbearance agreement or it would reinstitute a lawsuit against them."  Complaint at ¶ 69.

Following the agreement's execution, Refresh's struggles with repayment continued. Plaintiff complains that he requested, but was denied, an accounting of how Refresh's payments were being applied; that the billing schedules were perplexing; that he never understood how Premier was keeping its balances and invoices current; and that from 2003 through 2012, he did not receive amortization schedules.  Complaint at ¶¶ 69-70.  Shortly after the agreement went into effect, Refresh once again went into default.  See Complaint at ¶ 71, Docket # 2-4 at p. 204.  On April 14, 2010, counsel for Premier sent a letter to Mr. Angelo as well as to plaintiff "[i]ndividually and as [g]uarantor" providing notice of the default and demanding that (1) Refresh and (2) plaintiff as guarantor pay the then-current balance of $111,872.44.  See Docket # 2-4 at Ex. 44.

Approximately three months later, after Refresh had paid over $92,000 but was unable to continue making payments under the forbearance agreement, Premier brought an action in Massachusetts Superior Court against Refresh and plaintiff seeking payment pursuant to the Note, guaranty, and forbearance agreement.  Id. at ¶ 74; Docket #2-1 at Ex. 18.  On March 27, 2012, the

Superior Court allowed Premier's motion for summary judgment, dismissed plaintiff's counterclaims, and ordered an assessment of damages.  Docket # 47-1 at Ex. C.

In May 2012, plaintiff filed a voluntary petition for Chapter 13 bankruptcy, which later was converted to a Chapter 7 proceeding.  Complaint at ¶ 75.  In November 2012, Premier filed an adversary proceeding in which it objected to the discharge of plaintiff's debt.  See Docket # 47-1 at Ex. D.  In May 2013, plaintiff filed an amended schedule of his assets, which made no reference to a potential claim against Premier or any of the other defendants herein (apart from its listing the 2010 Superior Court action, in which plaintiff's counterclaims by that time had been dismissed).  See Docket # 47-1 at Ex. F.  In connection with the adversary proceeding, in October 2013 the Bankruptcy Court found that plaintiff twice presented false information and on another occasion concealed from the court relevant information.  See Docket # 47-1 Ex. H at pp. 2-4.  In a decision plaintiff states resulted from his attorney forfeiting his arguments, causing the bankruptcy judge to "t[ake] the bait" of "[d]efendants['] lies," the court denied plaintiff a bankruptcy discharge.  See id.; Complaint at ¶ 75.[8]

On January 17, 2014 the Superior Court denied plaintiff's motion to vacate the entry of summary judgment, and on April 18, 2014, Refresh and plaintiff were ordered to pay Premier $178,377.87.  Docket # 47-1 at Ex. L; Docket #2-4 at Ex. 30.  In December of that year, the Superior Court issued a final judgment directing Refresh and plaintiff to pay Premier that sum, plus approximately $95,000 in interest, $42,000 in attorney's fees, and costs. Docket # 47-1 at Ex. M.  Plaintiff filed a Notice of Appeal in January 2015.  Id. at Ex. N.

---

[8] Plaintiff's subsequent appeal of the Bankruptcy Court's decision and motion for reconsideration were denied in late 2014.  See Docket # 47-1 at Exs. I, J.

Summary of Plaintiff's Allegations

Throughout his Complaint and affidavit, Plaintiff takes great pains to illustrate a far-flung conspiratorial scheme involving each of the defendants.   Among his characterizations of the alleged scheme are these: defendants "go[ ] after conscientious, law-abiding Americans who may have fallen down on their luck, who had every intention of owning up to their obligations to the full extent of the law, but who Defendants could badger and goad, through the use of highly specious evidence, to attack their vulnerable victims."   Complaint at ¶ 83.   Somewhat more specifically, plaintiff alleges that, as opposed to legitimate debt collectors, Premier and its affiliates conduct a "legitimate scam" made possible by the parties tag-teaming one-another to provide the requisite (fraudulent) proof of their entitlement "to go after defaulters even without the documentation or proof of their legal right to do so." See id. at ¶ 85.  Plaintiff states the defendants' schemes "dovetail with their racketeering patterns, calculated to exert overwhelming pressure: fabricating evidence, witnesses, and disregarding corporate formalities."   Id. at ¶ 90.

Plaintiff alleges Richard Gleicher ("Gleicher"), a Premier Vice President, is the engine behind the racketeering operation.  For the purported purpose of demonstrating factors necessary to establish a RICO enterprise, plaintiff's Complaint quotes verbatim seven pages of Gleicher's deposition taken in connection with plaintiff's bankruptcy proceedings, in which Gleicher discusses Premier's operation.  Plaintiff contends the testimony—which consists of rather jejune descriptions of the company's operations—attests to the "incestuous business links between almost every person affiliated with Premier," which permit these entities "to work in concert of whatever bad works." See id. at ¶¶ 15, 26, 78-81, 107, 109.  Defendant John P. Bowen ("Bowen") is alleged to be the linchpin holding the scheme together.  Id. at ¶¶ 87-88.  An "insider," Bowen allegedly "could be counted on to fill in any missing link with an affidavit under oath."  Id. at ¶ 87.  With

Bowen's credibility in tow, defendants allegedly were free to force plaintiff and other victims "to yield to [defendants'] onerous collection demands under threats of homelessness and penury." Id. at ¶ 88. Plaintiff alleges Bowen corroborated Premier's claims that it was a valid successor to plaintiff's debt, and that inconsistencies in Bowen's signatures suggest that anyone could have been signing his name on documents such as the Sovereign Loan Purchase and Sale Agreement ("Sovereign Agreement") and Bowen's affidavit attesting to the sale of Premier's debt. Id. at ¶ 119; Zahoruiko Aff. at ¶ 11. According to plaintiff, Bowen's "role is to fool judges into thinking he holds files or direct knowledge of evidence which does not exist, or which are manufactured years later." Zahoruiko Aff. at ¶ 11. Plaintiff similarly alleges that defendant Thomas H. Curran (Gleicher and Premier's attorney) ("Curran") "works alongside them, corroborating their illegal acts, filing Motions in Limine in adversary proceedings to prevent facts (that [defendants] desperately concoct from thin air) from being corroborated." Complaint at ¶ 89. Cummings is accused of actions such as forgery, mishandling documents, and making false statements in furtherance of the conspiracy; Nicholas J. Maimonis (a Premier Vice President/Account Manager) is another alleged co-conspirator; and Christopher K. Pfirrman (a Santander Executive Vice President) allegedly writes "blank checks" for Bowen's criminal activity. See Zahoruiko Aff. at ¶¶ 9-11.

Plaintiff alleges the defendants furthered their alleged scheme via mail fraud, wire fraud, interference with commerce, money laundering in the form of payment demands, see Docket # 2 at ¶ 103 ("Each payment demand made by Defendants of Plaintiff constituted a money laundering transaction . . . ."), and conducting transactions involving property illegally derived. See generally id. at ¶¶ 95-104. He also contends that defendants' filing of lawsuits is part of a ploy "to deflect attention from [their] own illegality by finding fault with Plaintiff's actions." Id. at ¶ 105.

Much of the Complaint is similarly histrionic: plaintiff likens defendants to hijackers, gambling racketeers, and "classic '*Goodfellas*,' or 'S*opranos*,'" in that "they leave bullets in the lives of their victims." See id. at ¶¶ 6, 20, 82.  He alleges defendants' practices affected similar victims around the United States, attaches affidavits from such purported victims, and goes so far as to take aim at the legal system, which in his view has become an "unwitting all[y]" supporting the defendants' desire to "find money wherever they can." See id. at ¶¶ 129, 131.  In plaintiff's view, defendants' actions such as submitting motions in limine constitute a "muzzl[ing of] Plaintiff's ability to bark" and a "scorched earth litigation against [plaintiff]." See id. at ¶ 133. Other allegations appear to fly directly in the face of the record—for example, notwithstanding the chronology and correspondence described above, plaintiff submits that "[d]efendants never provided notice to Refresh [ ] of their intent to collect its debt." Id. at 120.  Instead, they employed "shock and awe" tactics such as attachment in order to force plaintiff to resort to increasingly onerous repayment terms, and "creating new reasons for adding more debt to the equation." See id.

Plaintiff submits that the Sovereign Agreement, which is dated June 2002, was first "magically 'produced'" to him in 2011, when Premier needed to produce new evidence in order to prevent losing a court case.  See Zahoruiko Aff. at ¶ 39.  In further support of his contention that the Sovereign Agreement was fraudulent, plaintiff states that the agreement lacked documentation as between Fleet and Sovereign, Sovereign and Premier, and various Premier entities.  See Zahoruiko Aff. at ¶ 42.  Fraudulent entities like Premier, in plaintiff's view, insist on this lack of documentation "for protection." See id. at ¶ 43.  Plaintiff also alleges that defendants failed to adhere to the agreement's terms—for example, citing a portion of the Sovereign Agreement that requires the Assignee (Premier) to deliver certain documentation to the Assignor

(Sovereign), and rhetorically asking why these materials were never presented to *plaintiff* as proof of Premier's bona fides.  <u>See</u> Complaint at ¶¶ 140-41; <u>see also id.</u> at ¶¶ 143-44 (citing contract provisions with which plaintiff suggests defendants did not comply).  He states that several portions of the agreement were "selectively and fraudulently deleted," <u>id.</u> at ¶¶ 145-47 and contends that *all* of the requirements for a valid contract are absent.  Zahoruiko Aff. at ¶¶ 45-46. He also takes issue with the fact that portions of the Sovereign Agreement are handwritten or incomplete, that it lists a then-inactive Premier entity, that Bowen's signature appears different from "legitimate" Bowen signatures, and other factors that, according to plaintiff, speak to this and related documents being fraudulent.  <u>See</u> Zahoruiko Aff. at ¶¶ 47-48.

Finally, plaintiff refers to Premier's assuming various iterations of its name (Premier Capital Limited Liability Corporation and Premier Capital, LLC, for example) as a "questionable practice" used to "[i]ntentionally creat[e] confusion."  Complaint at p. 42; ¶ 111.  According to plaintiff, this is "a blatant example of [defendants'] penchant for intentional legal obfuscation." <u>Id.</u> at ¶ 113.  Plaintiff contends that only "Premier Capital, Inc." is legitimately incorporated in Massachusetts, and the Premier entities with which plaintiff dealt "were never registered in Delaware or Massachusetts, although they claimed to be."  <u>Id.</u> at ¶¶ 122-23; Zahoruiko Aff. at ¶¶ 13, 15.  He alleges that "[w]henever PREMIER CAPITAL, LLC . . . is ever in a bind, the Racketeering Operation and its attorneys switch" to one of six alternate spellings.  Zahoruiko Aff. at ¶ 14.

On the strength of these allegations, plaintiff asserts twenty-three counts against ten Premier entities, Santander, six individual defendants, and one hundred John Doe defendants, most of which sound in some iteration of racketeering, fraud, extortion and/or conspiracy.  <u>See generally</u> Complaint at ¶¶ 149-223.  He seeks various forms of monetary and equitable relief, including

damages, accounting, injunctions, dismissal of all actions presently pending against him, and attachment of defendants' property.  See id. at pp. 73-75.

<u>Premier, Gleicher, Cummings & Curran's Motion to Dismiss</u>

Defendants Premier, Gleicher, Cummings, and Curran (collectively, the "Premier Defendants") seek dismissal on several grounds: plaintiff's lack of standing, res judicata, statute of limitations, and the Complaint's failure to assert a plausible cause of action.  See generally Docket # 47.  As discussed below, the Premier Defendants' standing argument should be allowed and therefore divests this court of subject matter jurisdiction over this matter; accordingly, it is the only issue worthy of exploration.

<u>Legal Standard</u>

The question of which legal standard applies to the portion of the Premier Defendants' motion sounding in Fed. R. Civ. P. 12(b)(1) depends on a critical distinction—whether this is a factual or facial challenge to the court's jurisdiction.  As explained by the Seventh Circuit in <u>Apex Digital, Inc. v. Sears, Roebuck & Co.</u>, 572 F.3d 440 (7th Cir. 2009),

> [f]acial challenges require only that the court look to the complaint and see if the plaintiff has sufficiently *alleged* a basis of subject matter jurisdiction. . . . In contrast, a factual challenge lies where the complaint is formally sufficient but the contention is that there is *in fact* no subject matter jurisdiction.

<u>Id.</u> at 443-44 (citing <u>Lawrence v. Dunbar</u>, 919 F.2d 1525, 1529 (11th Cir. 1990) and quoting <u>United Phosphorus, Ltd. v. Angus Chem. Co.</u>, 322 F.3d 942, 946 (7th Cir. 2003)) (internal quotation marks omitted) (emphases in original).

The distinction is important for at least two reasons.  First, "[t]he law is clear that when considering a motion that launches a factual attack against jurisdiction, [t]he district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence

has been submitted on the issue to determine whether in fact subject matter jurisdiction exists."

Id. (quoting Evers v. Astrue, 536 F.3d 651, 656-57 (7th Cir. 2008) and citing cases) (internal

quotation marks omitted).  Further and perhaps more significantly,

> [t]he facial attack does offer similar safeguards to the plaintiff [as
> Rule 12(b)(6) and Rule 56]: the court must consider the allegations
> of the complaint as true.  The factual attack, however, differs greatly
> for here the trial court may proceed as it never could under 12(b)(6)
> or Fed. R. Civ. P. 56.  Because at issue in a factual 12(b)(1) motion
> is the trial court's jurisdiction[—]its very power to hear the case[—
> ] there is substantial authority that the trial court is free to weigh the
> evidence and satisfy itself as to the existence of its power to hear the
> case.  In short, no presumptive truthfulness attaches to plaintiff's
> allegations, and the existence of disputed material facts will not
> preclude the trial court from evaluating for itself the merits of
> jurisdictional claims. Moreover, the plaintiff will have the burden of
> proof that jurisdiction does in fact exist.

Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977) (bracketed

information supplied) (citing 5 C. Wright and A. Miller, Federal Practice and Procedure s 1350

(1969)).   Here, the Premier Defendants' motion is most appropriately viewed as a factual

challenge, inasmuch as it does not challenge the basis for this court's jurisdiction alleged in the

Complaint (i.e. a federal question arising under the RICO Act, see Complaint at ¶ 39), but instead

argues that facts alleged in the Complaint—plaintiff's filing of a bankruptcy petition—call the

court's jurisdiction into question.   Accordingly, as detailed above, in making its jurisdictional

determination, the court (1) may consider evidence extrinsic to the pleadings; and (2) is not

constrained to construe the facts in the light most favorable to the plaintiff.  See, e.g., Houston v.

Marod Supermarkets, Inc., 733 F.3d 1323, 1335-36 (11th Cir. 2013) (adopting this approach in

standing-based factual challenge to subject matter jurisdiction).   Additionally, it is plaintiff's

burden to demonstrate the court's jurisdiction.  See Mortensen, supra; e.g., Johansen v. United

States, 506 F.3d 65, 68 (1st Cir. 2007) ("When a defendant moves to dismiss for lack of federal

subject matter jurisdiction, the party invoking the jurisdiction of a federal court carries the burden of proving its existence.") (quoting <u>Murphy v. United States</u>, 45 F.3d 520, 522 (1st Cir.), <u>cert. denied</u>, 515 U.S. 1144, 115 (1995)).   At the same time, the court is cognizant of the fact that plaintiff is proceeding *pro se* and, as such, that his Complaint is accorded "an extra degree of solicitude" pursuant to the more lenient standards afforded *pro se* litigants.   See <u>Rodi v. Ventetuolo</u>, 941 F.2d 22, 23 (1st Cir. 1991) (citing cases); <u>e.g.</u>, <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007).   "Even under the liberal standard by which they are reviewed, however, *pro se* complaints must satisfy basic pleading essentials, such as subject matter jurisdiction."   <u>Geller v. United States</u>, No. 00 Civ. 1116, 2001 WL 1346669, at *3 (S.D. Ohio Sept. 26, 2001) (citing <u>Wells v. Brown</u>, 891 F.2d 591, 594 (6th Cir. 1989)).

<u>Applicable Law</u>

It is beyond cavil that a plaintiff must have standing to bring a claim in federal court.   See, e.g., <u>Van Wagner Boston, LLC v. Davey</u>, 770 F.3d 33, 36 (1st Cir. 2014).   Without this "irreducible constitutional minimum," the court lacks subject matter jurisdiction.   See <u>id.</u> (quoting <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992)); <u>e.g.</u>, <u>United Seniors Ass'n, Inc. v. Philip Morris USA</u>, 500 F.3d 19, 23, 26-27 (1st Cir. 2007) (citing <u>Steel Co. v. Citizens for Better Env't</u>, 523 U.S. 83, 94-95 (1998)); <u>In re Weaver</u>, 632 F.2d 461, 462 n.6 (5th Cir. 1980) ("Because standing is an element of the constitutional requirement of 'case or controversy,' lack of standing deprives the court of subject matter jurisdiction.").   The Premier Defendants argue that plaintiff's filing of a bankruptcy petition created an estate comprising all of plaintiff's legal and equitable interests; as such, it is only that estate—rather than plaintiff personally—which may assert a cause of action.   They contend this is so despite the fact that plaintiff did not disclose in either his original

or amended bankruptcy schedules the claims now asserted in his Complaint.  See Docket # 47 at pp. 8-10.

Plaintiff does not contest the legal principles underlying this argument, which are well-supported by First Circuit authority.  Indeed, "[w]hen a bankruptcy petition is filed, all the debtor's interests in property as of the filing date, including any legal claims, automatically become the property of the bankruptcy estate."  Elkins v. Elkins, No. 09 Civ. 582, 2010 WL 2301152, at *3 (D. Me. June 7, 2010) (citing 11 U.S.C. § 541(a)(1) and cases), report and recommendation adopted, No. 09 Civ. 582, 2010 WL 2651590 (D. Me. June 25, 2010).  Thus, "[t]he bankruptcy trustee has exclusive standing to pursue causes of action that are property of the bankruptcy estate . . . ."  Saunders v. Getchell Agency, No. 13 Civ. 00244, 2014 WL 559040, at *4 (D. Me. Feb. 11, 2014) (citing cases).  This is true even where, as here, a debtor fails to list those claims on his bankruptcy schedules.  See, e.g., Roggio v. City of Gardner, No. 10 Civ. 40076, 2011 WL 4369448, at *2 (D. Mass. Sept. 16, 2011) ("If a claim is not properly scheduled prior to the close of the bankruptcy case, it 'remains the property of the bankrupt estate, and the debtor loses all rights to enforce it in [her] own name.'") (quoting Jeffrey v. Desmond, 70 F.3d 183, 186 n.3 (1st Cir. 1995)).

Significantly, courts interpret broadly 11 U.S.C. § 541(a)(1), which defines a bankruptcy estate as including "all legal or equitable interests of the debtor in property as of the commencement of the case."  See, e.g., Chartschlaa v. Nationwide Mut. Ins. Co., 538 F.3d 116, 122 (2d Cir. 2008) (quoting 4 Collier on Bankruptcy ¶ 541.01 (15th ed. 2001) that "'[i]t would be hard to imagine language that would be more encompassing' than this broad definition.").  To this end, "[e]very conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of § 541."  Id. (quoting In re Yonikus, 996 F.2d 866, 869 (7th

Cir. 1993)); <u>Roggio</u>, 2011 WL 4369448, at *2 ("Under 11 U.S.C. § 541(a)(1), all claims and causes of action of a debtor in bankruptcy that have accrued as of the filing of the bankruptcy case become property of the bankruptcy estate.  A debtor seeking shelter under the bankruptcy laws is obligated to disclose *all* assets to the Bankruptcy Court, including contingent claims.") (citing cases and 11 U.S.C. § 521(a)(1)) (internal citations omitted) (emphasis in original).  It thus follows that "[n]ot all facts need be known before a debtor is required to notify the bankruptcy court of the potential asset." <u>Talosig v. US Bank N.A.</u>, No. 15 Civ. 2433, 2016 WL 632796, at *2 (E.D. Cal. Feb. 17, 2016) (citing <u>Hay v. First Interstate Bank of Kalispell, N.A.</u>, 978 F.2d 555, 557 (9th Cir. 1992)); <u>see also</u> <u>Grammer v. Mercedes Benz of Manhattan</u>, No. 12 Civ. 6005, 2014 WL 1040991, at *3 (S.D.N.Y. Mar. 13, 2014) ("Even if Grammer's claims were not perfected until the EEOC filed its right to sue letter, if a debtor is aware of facts that may give rise to a possible cause of action, then that is a 'known' cause of action such that it must be disclosed.") (quoting <u>Sea Trade Co. Ltd. v. FleetBoston Financial, Corp.</u>, No 03 Civ. 10254, 2008 WL 4129620, at * 12 (S.D.N.Y. Sept. 4, 2008)) (internal quotation marks omitted).

In sum, therefore, where a debtor filing for bankruptcy either knows or should know of a potential legal claim, such claim falls under the estate's umbrella, which, as noted, is exclusive of the debtor.  <u>See, e.g.</u>, <u>In re SII Liquidation Co.</u>, No. 10 B.R. 60702, 2014 WL 5463883, at *7 (Bankr. N.D. Ohio Oct. 24, 2014) (claims of which debtor knew or should have known are property of the bankruptcy estate), <u>appeal dismissed sub nom.</u> <u>Schwab Indus., Inc. v. Huntington Nat. Bank</u>, No. 14 Civ. 2578, 2015 WL 2412317 (N.D. Ohio May 20, 2015); <u>Solano v. Am. Bankers Ins. Co. of Florida</u>, 365 B.R. 196, 198-99 (D. Colo. 2007) (debtor not entitled to pursue PIP claims she failed to list on bankruptcy schedules, where she "knew or should have known that American

Bankers was refusing to pay her enhanced PIP benefits.").[9]  As such, the relevant question becomes whether, at the time he filed his amended bankruptcy schedules, plaintiff possessed sufficient information to suggest a possible cause of action against the Premier Defendants; if so, any such claim would belong exclusively to the bankruptcy estate, and accordingly plaintiff would lack standing to bring this action.  Despite plaintiff's assertion that this is not the case, the record plainly demonstrates otherwise.

Discussion

Plaintiff's amended bankruptcy schedule is dated May 28, 2013.[10]  See Docket # 47-1 at Ex. F.  As discussed above, all allegations in the Complaint concern events predating that time. Further, the notion that in May 2013 plaintiff lacked sufficient information to recognize the prospect of the instant lawsuit is belied by his various antecedent filings containing allegations nearly identical to those currently before the court.  See Docket # 47-1 at Ex. A ¶ 3, Second (October 2010 Answer alleging Premier "induc[ed plaintiff and Refresh] to execute the Promissory Note and Guaranty and the Forbearance Agreement, while failing to demonstrate that it was the rightful assignee of an obligation owed by Defendants"); Ex. B ¶¶ 9, 23 (November 2010 counterclaims alleging Premier refused to provide documentation as to its right to enforce plaintiff's debt or plaintiff's payments thereon, thus constituting unfair debt collection practices);

---

[9] As indicated in Solano, such claims may be barred either due to lack of standing or on the related ground of judicial estoppel.  See 365 B.R. 196, 199 (D. Colo. 2007) ("As a result [of failing to disclose claims which she knew or should have known of], Solano is not permitted to pursue any of her claims in this court, either because she is not the real party in interest, [Wieburg v. GTE Sw. Inc., 272 F.3d 302, 305-08 (5th Cir. 2001)] (holding that the trustee is the real party in interest and has exclusive standing to assert pre-petition claims) or under a judicial estoppel theory . . . .") (citing Barger v. City of Cartersville, 348 F.3d 1289 (11th Cir. 2003)).

[10] Some pages list a May 15, 2013 date.  See Docket # 47-1 at Ex. F.

Ex. E pp. 34-36 (December 2010 Answer alleging note "was obtained by bad faith, misrepresentation, fraud, and unfair and deceptive practices").[11]

Nor is plaintiff availed by the argument that it was not until after the bankruptcy proceedings were concluded that he conducted "extensive research" which revealed "information regarding Defendants that would support a cause of action." See Docket # 54 at pp. 5-6. First, no such research was necessary to support plaintiff's action—it is beyond dispute that no later than 2010, plaintiff possessed sufficient information to bring this lawsuit. As noted, any post-May 2013 revelation of additional information is of no moment, so long as, at the time he filed his amended schedules, plaintiff was "aware of facts that may give rise to a possible cause of action." See Grammer, 2014 WL 1040991, at *3. Further, there was nothing preventing plaintiff from conducting this research prior to filing his bankruptcy schedules, particularly in light of his "nagging suspicion *over the last 12 years*" that the defendants' debt collection practices were illegitimate. See Complaint at ¶ 6 (emphasis added).[12]

In sum, there is no basis to conclude—indeed the record eviscerates the notion—that information necessary to the filing of this lawsuit either became available or should have become available to plaintiff only after plaintiff filed his amended bankruptcy schedule. Plaintiff's claims

---

[11] While true that these materials reference Premier rather than the individual Premier Defendants, the nature of plaintiff's allegations dictates that this conclusion applies with equal force to the latter as well. As discussed more fully below, the allegations of these individuals' purported misdeeds plainly are intertwined with those concerning Premier, see, e.g., Affidavit at ¶¶ 9-10, and accordingly, plaintiff's standing to bring his claims against these defendants rises and—as is the case here—falls with that of his claims against Premier.

[12] Moreover, plaintiff's credibility in this, or any other, regard, cannot be viewed in a vacuum. As discussed, the bankruptcy court found that plaintiff presented false information and testimony on two separate occasions and concealed relevant information on a third. See Docket # 47-1 at Ex. H at pp. 2-4. It also bears mention that plaintiff "demonstrably knew [he] could amend [his] schedules during the case, and did so when the circumstances required it, but did not do so to include [his] causes of action." See In re Ingram, 531 B.R. 121, 126 (Bankr. D.S.C. 2015).

against the Premier Defendants thus belong exclusively to the bankruptcy estate, and as such, plaintiff lacks standing to bring this action against the Premier Defendants.  I therefore recommend that the Premier Defendants' motion for dismissal be allowed.  In light of this conclusion, I refrain from addressing further the claims asserted against these defendants.  See, e.g., United Seniors Ass'n, 500 F.3d at 23 ("The federal courts are required to determine whether Article III jurisdiction exists prior to proceeding to the merits of the case.") (citing cases); W.C. Motor Co. v. Talley, 63 F. Supp. 3d 843, 848 (N.D. Ill. 2014) ("Only if the court has subject matter jurisdiction may it address whether the suit is barred by res judicata or whether it states a viable and timely claim under the FAA, which are merits issues.") (citing cases); Exum-Petty v. Baptist Mem'l Health Care Sys., Inc., No. 92 Civ. 335, 1995 WL 1945392, at *2 (N.D. Miss. May 19, 1995) ("Standing is a threshold issue that must be addressed before a determination on the merits can be made.").

Santander Bank, Pfirrman, Bowen, and Maimonis' Motions to Dismiss

Defendants Santander Bank, Christopher Pfirrman, and John Bowen (collectively, the "Santander Defendants") and Nicholas Maimonis have submitted separate motions for dismissal. Neither of these motions raises the issue of lack of standing arising from plaintiff's bankruptcy petition.  "Standing, however, raises jurisdictional questions and we are required to consider the issue sua sponte to ensure that there is an Article III case or controversy before us." Rector v. City & Cty. of Denver, 348 F.3d 935, 942 (10th Cir. 2003) (quoting People for the Ethical Treatment of Animals v. Rasmussen, 298 F.3d 1198, 1202 (10th Cir. 2002)) (internal quotation marks omitted); see also Van Wagner, United Seniors Ass'n, Weaver, supra.  Accordingly, before proceeding to the merits of the Santander Defendants and Maimonis' motions, I must determine whether the Premier Defendants' standing argument applies with equal force to these defendants. If so, the court is divested of subject matter jurisdiction as to all of plaintiff's claims.

18

I answer this question in the affirmative.  As noted, plaintiff takes great pains to demonstrate how each of the defendants were cogs within the same alleged scheme.  <u>See</u> Complaint at ¶¶ 8, 10, 78, 80, 114, 152, 159; Aff. at ¶¶ 7-11; <u>see also</u> footnote 11, <u>supra</u>.  What emerges, at bottom, is that plaintiff's claims against the Premier Defendants and those against the Santander Defendants and Maimonis are essentially one and the same, at least for purposes of determining whether the claims against the latter—like those against the Premier Defendants—were of sufficient heft at the time of plaintiff's bankruptcy filing so as to become part of plaintiff's bankruptcy estate.  It therefore follows that the court lacks Article III jurisdiction over all of plaintiff's claims; not only those asserted against the Premier Defendants, despite the fact that only the Premier Defendants moved for dismissal on this basis.  For this reason, and in light of the authority cited above, <u>see</u> <u>United Seniors Ass'n</u>, <u>Talley</u>, <u>Exum-Petty</u>, <u>supra</u>, I decline (indeed am proscribed from conducting) further analysis on the merits of plaintiff's allegations, and recommend that the complaint be dismissed in its entirety due to plaintiff's lack of standing to bring this action.

## <u>CONCLUSION</u>

In accordance with the foregoing, I recommend that the court:

- allow the Premier Defendants' motion (Docket # 46) and dismiss plaintiff's Complaint as against Premier, Gleicher, Cummings, and Curran;

- enter a *sua sponte* order dismissing plaintiff's Complaint as against Santander Bank, Pfirrman, Bowen, and Maimonis; and

- deny as moot the Santander Defendants' motion (Docket # 39) and Maimonis' motion (Docket # 41).

/s/ David H. Hennessy
David H. Hennessy
UNITED STATES MAGISTRATE JUDGE